'FILED
COURT OF APPEALS
DIVISION II

2014 MAR -4 AM 9: 17

STATE OF WASHINGTON

BY_____
DEPUTY

**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| RUBY JUMAMIL,<br><br>     Appellant,<br><br>  v.<br><br>LAKESIDE CASINO, LLC, a Washington limited liability company d/b/a FREDDIE'S CLUB CASINO OF FIFE; NOEL COON and JANE DOE I, husband and wife; SUSAN MUDARRI and JOHN DOE, husband and wife; and DOUG WEST and JANE DOE II, husband and wife,<br><br>     Respondents. | No. 43620-5-II<br><br><br>PUBLISHED OPINION |

PENOYAR, J.P.T.[1] — Ruby Jumamil appeals the trial court's summary dismissal of defendant Noel Coon from her wage withholding and wage rebating claims and dismissal of defendant Doug West from her wage rebating claim under RCW 49.52.050 and RCW 49.52.070. Jumamil initially filed various wage claims against Lakeside Casino, LLC, d/b/a Freddie's Club Casino of Fife (the Casino), her former place of employment; Coon, the Casino's sole LLC manager; and West, one of the Casino's poker room floor supervisors. After the summary dismissal of Coon and West, a jury found the Casino liable for willful wage withholding and rebating. Shortly after the trial court entered judgment against the Casino, the Casino filed for bankruptcy.

Jumamil now argues that the trial court improperly dismissed Coon from her wage withholding claim because he willfully withheld her wages after learning about the Casino's dealer support policy, which required that poker dealers gamble an average of six hours a week

---

[1] Judge Penoyar is serving as a judge pro tempore of the Court of Appeals, Division II, pursuant to CAR 21(c).

to retain their seniority and which policy ultimately led to the withholding of Jumamil's wages. Jumamil also argues the trial court improperly dismissed Coon and West from her wage rebating claim because Coon received and West collected a rebate of her wages by requiring her to gamble back her wages to the Casino under the dealer support policy.

We hold a manager of an LLC is liable for improper wage withholding only where he knowingly participated in the wrongful withholding. Because Coon failed to release Jumamil's withheld wages after learning about the dealer support policy, he knowingly and willfully withheld her wages in violation of RCW 49.52.070. Accordingly, we reverse summary judgment as to Coon, hold Coon liable for willful wage withholding, and remand for an entry of costs and reasonable attorney fees against Coon under RCW 49.52.070. We also reverse the summary dismissal of Coon and West from Jumamil's wage rebating claim and remand for further proceedings because there are genuine issues of material fact regarding whether Coon and West collected or received a rebate of Jumamil's wages.

We reverse and remand for further proceedings consistent with this opinion.

## FACTS

### I. BACKGROUND

The Casino was initially owned by Susan Mudarri and her husband, Eugene Mudarri Jr. At that time, Noel Coon had only a two percent membership interest in the Casino. After Mr. Mudarri's passing, Coon increased his ownership interest to 51 percent, with Ms. Mudarri retaining a 49 percent interest. Coon became the sole Casino manager with the "sole authority to decide whether and when to sell the Company, its assets and/or business." Clerk's Papers (CP) at 364; *see also* CP at 359 (Washington Secretary of State listing Coon as the managing member of the Casino). Coon also agreed to "oversee the Company's business with the goal of making it

2

profitable and attractive for sale" and to loan up to $200,000 to the Casino as needed to enable it to become profitable. CP at 364. Coon listed himself as the "highest-ranking" individual on the license renewal applications to the Washington State Gambling Commission, which he signed as the Casino's managing member. CP at 368. Coon also identified himself as managing member on promissory notes for payment to Hana Hou Wailea, LLC, from the Noel T. Coon Living Trust. Coon and Ms. Mudarri shared the Casino profits equally; however, neither was entitled to receive a salary for their services performed. Upon the sale of the Casino, Coon was entitled to receive the first $5,000,000 of net proceeds.

Coon lives in Texas and visited the Casino occasionally to check in with the managers or to have lunch in the Casino restaurant. Coon stated that he did not write checks on the Casino's behalf, set employee wages, or make any decisions about the payment or nonpayment of wages; nor was he aware of any employee policies. Instead, he stated he relied on the Casino management to make personnel, wage, and employee policy decisions. Jumamil acknowledged that she only saw Coon eating lunch at the Casino once when another dealer pointed him out. Jack Newton is the Casino manager.

Jumamil began working at the Casino in November 2006 and became a poker dealer in May 2007. In May 2010, the Casino implemented a new dealer support[2] policy, which required dealers to gamble an average of six hours per week to retain their seniority. If the dealers failed to meet the six-hour-per-week average, they lost seniority, and on slow shifts would be the first dealers sent home. Doug West, a poker room floor supervisor who handles scheduling and

---

[2] Dealer support is a practice where poker dealers who are not dealing play at another dealer's table to keep the game from ending due to a lack of other poker players playing.

hiring of poker dealers, stated dealer support was voluntary. In contrast, Daniel Carruthers, a

poker dealer and poker room floor supervisor, testified:

> Saying that dealer support was not "mandatory" gives the impression that dealers had a clear choice as to whether they gambled or not. In reality, that "choice" was forced upon dealers who needed to make a difficult financial calculation: will we make more money in the extra hours that we keep than we will lose gambling for six hours? . . . I would not characterize my decision to gamble during that time as a "choice" of my own free will.

CP at 183.

West was involved in developing, implementing, and enforcing the dealer support

policy.[3] West authored a memorandum on the policy in which he cautioned that dealers will find

themselves "on the bottom instantly if they fail one week to maintain a 6 hour average," and that

dealers "showing a commitment to the success of the room may also be rewarded with additional

shifts as they become available." CP at 243. One dealer noted that the Casino referred to the

gambling by dealers under the policy as "keeping [their] stars." CP at 272. The poker room

floor supervisors recorded the dealer support hours in a "Dealer Tracking Log," which

documented the dealers' gambling time to the quarter hour. CP at 190.

Under the policy, the dealers mostly played Texas Hold'em poker, which required all

players to make forced bets known as blinds. Thus, the dealers could not sit at a table for six

hours and not bet any money. The Casino took $3.00 in the form of the "rake" and a $0.20

jackpot administration fee from each hand played. CP at 111. Jumamil acknowledged that a

small percentage of the money she was required to gamble under the dealer support policy went

directly to the Casino, while the rest went to the other players. Jumamil stated that even though

the majority of her money did not go directly to the Casino, the Casino considered dealers'

---

[3] The Casino designated West as its CR 30(b)(6) corporate designee.

4

gambling as "support[ing] the casino." CP at 256. Also, West noted that the spike in recent business at the Casino was due largely to dealers providing dealer support per the policy.

Jumamil did her weekly six hours of dealer support for a few weeks. But a month or so after the Casino instituted the dealer support policy, Jumamil spoke with West and told him she could no longer provide the minimum six hours of dealer support because she recently had a baby and could not put in the extra hours.[4] West responded, "Well, then you're not going to have a job," and that Jumamil was "not the only one that just had a baby." CP at 263. After Jumamil stopped providing the six-hour-per-week average of dealer support, she was sent home early three to four times because her seniority dropped. Jumamil's last day of providing any dealer support was August 6, 2010.

Other dealers noted the financial and time burdens the dealer support policy created. Tera Frydenlund, a poker dealer, stated it was difficult to find six hours a week extra to gamble and that it was almost like an extra shift, which was especially difficult because, as a single mom, she had to arrange for child care. Carruthers stated he had to stop providing dealer support because he was losing too much money. He also recently had a baby and did not have the extra time to provide dealer support.

On August 17, 2010, approximately two weeks after Jumamil stopped providing dealer support, West terminated Jumamil for "excessive dealer mistakes and inadequate hand speed." CP at 63. West stated that dealer support was not discussed with Jumamil and it was not contemplated as a reason for Jumamil's termination.

---

[4] West stated the dealers could receive minimum wage while providing dealer support during their paid breaks or if they came in before or after a shift. Jumamil; Tera Frydenlund, a poker dealer; and Carruthers contest West's statement. Jumamil also stated there often was not enough time to provide dealer support during breaks and that dealers often did not get as frequent of breaks as West and Coon claim.

At the beginning of October 2010, Jumamil sent a letter to the Casino claiming wrongful termination, wage withholding, and wage rebating. After receiving Jumamil's letter, the Casino stopped the dealer support policy on October 15, 2010, which West testified was due to the potential of this lawsuit.

## II.    PROCEDURAL HISTORY

Jumamil filed her complaint on October 19, 2010, alleging seven causes of action; only relevant here are her wage claims under RCW 49.52.050 and RCW 49.52.070. Coon moved for summary judgment on the basis that he had not willfully or intentionally withheld Jumamil's wages, nor had he received a rebate of any of Jumamil's wages. The trial court, finding no material issue of fact, granted Coon's motion for summary judgment.

West then moved for summary judgment on the basis that he had not received or collected any rebate of Jumamil's wages. The trial court granted summary judgment, dismissing West as well.

A jury returned a verdict against the Casino in favor of Jumamil on her minimum wage act claim, her wage rebating claim, and her wrongful discharge claim. The jury found that (1) the Casino had failed to compensate Jumamil for all her hours worked; (2) the Casino's failure to compensate Jumamil was willful; (3) the total amount of wages the Casino did not pay to Jumamil was $288.99; (4) the Casino had required Jumamil to rebate wages to the Casino; (5) the Casino's rebate of Jumamil's wages was willful; (6) the total amount of wages the Casino required Jumamil to rebate was $811.20; (7) the Casino had discharged Jumamil in violation of public policy; and (8) the total amount of Jumamil's damages proximately caused by the Casino's wrongful termination was $28,000.00. The trial court also awarded Jumamil $125,000.00 in attorney fees and $10,000.00 in costs. Approximately two weeks after the trial

court issued the judgment against the Casino, the Casino filed for bankruptcy. *See In re Lakeside Casino, LLC*, No. 12-44552-BDL (Bankr. W.D. Wash. June 28, 2012).[5]

Jumamil timely appealed. Shortly after filing her appeal, Jumamil filed a separate lawsuit against Newton for wage withholding and wage rebating in violation of RCW 49.52.070. In July 2012, Newton made an offer of judgment to Jumamil for $2,794.48, which Jumamil ultimately accepted.[6] Although the evidence regarding the jury trial and the second lawsuit against Newton were not part of the trial court's record on summary judgment, a commissioner of this court granted West and Coon's motion to include it in the record on appeal because the "documents may change the result of the appeal." CP at 638.

## ANALYSIS

### I. STANDARD OF REVIEW

We review an order for summary judgment de novo, engaging in the same inquiry as the trial court. *Jones v. Allstate Ins. Co.*, 146 Wn.2d 291, 300, 45 P.3d 1068 (2002). Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c). "A material fact is one upon which the outcome of the litigation depends." *Clements v. Travelers Indem. Co.*, 121 Wn.2d 243, 249, 850 P.2d 1298 (1993).

We construe all facts and the reasonable inferences from those facts in the light most favorable to the nonmoving party. *Jones*, 146 Wn.2d at 300. Summary judgment is proper only

---

[5] The Casino's bankruptcy case is still pending.

[6] This number was reached by doubling the wages Jumamil claimed were due ($288.99 for willful non-payment of wages and $811.20 for willful rebating) plus 12 percent interest.

if reasonable persons could reach but one conclusion from the evidence presented. *Bostain v. Food Express, Inc.*, 159 Wn.2d 700, 708, 153 P.3d 846 (2007).

II.    MOTION TO STRIKE

West and Coon argue Jumamil improperly used facts and evidence in her arguments on appeal that were not before the trial court at summary judgment. With the exception of the supplemental exhibits the commissioner of our court ordered we would consider on appeal, we consider only the facts and evidence before the trial court at summary judgment in reaching our decision on appeal.

III.    JUMAMIL'S CLAIMS ARE NOT BARRED ON APPEAL

A.    JUMAMIL'S CASE IS NOT MOOT

West and Coon argue Jumamil's claims are moot because after West and Coon were summarily dismissed, Jumamil accepted payment from Newton for the same wage claims she initially alleged against West and Coon. But, Jumamil may still receive effective relief and, thus, her wages claims are not moot.

A case is moot if a court can no longer provide effective relief. *SEIU Healthcare 775NW v. Gregoire*, 168 Wn.2d 593, 602, 229 P.3d 774 (2010); *see also City of Sequim v. Malkasian*, 157 Wn.2d 251, 259, 138 P.3d 943 (2006) ("'The central question of all mootness problems is whether changes in the circumstances that prevailed at the beginning of litigation have forestalled any occasion for meaningful relief.'" (quoting 13A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3533.3, at 261 (2d ed. 1984))). Under RCW 49.52.070, when the employee prevails in her wage claims, she is entitled to exemplary damages together with legal costs and reasonable attorney fees. Thus, "[w]here liability is found, the civil remedy is personal liability for exemplary damages *and* attorney fees."

*Morgan v. Kingen*, 166 Wn.2d 526, 538, 210 P.3d 995 (2009) (emphasis added). "By providing for costs and attorney fees, the Legislature has provided an effective mechanism for recovery even where wage amounts wrongfully withheld may be small." *Schilling v. Radio Holdings, Inc.*, 136 Wn.2d 152, 159, 961 P.2d 371 (1998). Here, Newton paid Jumamil only her exemplary damages for her wage claims, but not her legal costs or attorney fees. Because Jumamil is entitled to costs and attorney fees in addition to the exemplary damages, the court can still provide Jumamil effective relief and her case is not moot.

West improperly relies on *Yates v. State Board for Community College Education*, 54 Wn. App. 170, 773 P.2d 89 (1989) to argue that Jumamil's case is moot because she has since accepted payment for her wage claims from Newton. Yates, a guidance counselor at Columbia Basin College, filed an action for wages allegedly owed while his union was in the process of negotiating payroll contract issues with Columbia Basin. *Yates*, 54 Wn. App. at 171, 173. After Yates filed his complaint, Columbia Basin and the union reached an agreement and Yates accepted payment of his wages under the newly-settled contract. *Yates*, 54 Wn. App. at 173-74. Yates argued that his acceptance of payment did not moot his claim for attorney fees and costs because "he was paid only after he was forced to bring suit and incur those fees." *Yates*, 54 Wn. App. at 175. The court rejected Yates's argument and stated, "Contrary to his argument he was forced to bring suit, if anything his suit was premature to resolution of good faith negotiations." *Yates*, 54 Wn. App. at 176.

Here, there was no bargaining or negotiating over Jumamil's claims as there was in *Yates*. And Jumamil did not prematurely file a suit against West and Coon. Instead, Jumamil had to sue to recover damages for her wage claims after West terminated her employment at the Casino. The record does not show that the Casino offered to negotiate or discuss Jumamil's claimed

9

damages with her; but instead, shortly after Jumamil notified the Casino of her intent to sue, the Casino stopped its dealer support policy due to the potential of a lawsuit. Thus, *Yates* is not controlling here and Jumamil's case is not moot.

B.  JUMAMIL'S WAGE CLAIMS ARE NOT BARRED BY RES JUDICATA

West and Coon also contend res judicata bars Jumamil from continuing to assert her wage claims against them because Jumamil accepted payment from Newton on wage claims identical to those alleged against West and Coon and then dismissed Newton with prejudice. Thus, they maintain that Jumamil cannot relitigate these identical wage claims against them. Because West and Coon failed to argue res judicata below and because the claims against West and Coon were not subsequent to the claim against Newton, Jumamil's wage claims against West and Coon are not barred by res judicata.

Whether res judicata bars an action is a question of law we review de novo. *Lynn v. Dep't of Labor & Indus.*, 130 Wn. App. 829, 837, 125 P.3d 202 (2005). Res judicata is a doctrine of claim preclusion. *Williams v. Leone & Keeble, Inc.*, 171 Wn.2d 726, 730, 254 P.3d 818 (2011). It bars the relitigation of claims and issues that were litigated, or could have been litigated, in a prior action. *Pederson v. Potter*, 103 Wn. App. 62, 67, 11 P.3d 833 (2000). The person asserting the defense of res judicata bears the burden of proof. *Hisle v. Todd Pac. Shipyards Corp.*, 151 Wn.2d 853, 865, 93 P.3d 108 (2004). "The threshold requirement of res judicata is a final judgment on the merits in the prior suit." *Hisle*, 151 Wn.2d at 865. "Once that threshold is met, res judicata requires sameness of subject matter, cause of action, people and parties, and 'the quality of the persons for or against whom the claim is made.'" *Hisle*, 151 Wn.2d at 865-66 (quoting *Rains v. State*, 100 Wn.2d 660, 663, 674 P.2d 165 (1983)).

Res judicata is an affirmative defense that is waived if it is "not affirmatively pleaded, asserted with a motion under CR 12(b), or tried by the express or implied consent of the parties." *Farmers Ins. Co. of Wash. v. Miller*, 87 Wn.2d 70, 76, 549 P.2d 9 (1976); *see also* CR 8(c). A claim for res judicata will not be considered for the first time on appeal. *See Milligan v. Thompson*, 110 Wn. App. 628, 633, 42 P.3d 418 (2002) (refusing to consider appellant's res judicata argument because appellant did not argue res judicata when he opposed the respondent's summary judgment motion in the trial court). We consider "only evidence and issues called to the attention of the trial court." RAP 9.12.

Further, there was no prior action in this case. Jumamil filed her complaint against Newton on July 2, 2012, after the trial court summarily dismissed West and Coon and after Jumamil appealed their dismissal. Res judicata prevents the relitigation of claims from a *prior* action. *Hisle*, 151 Wn.2d at 865. West and Coon, who bear the burden of proof here, have pointed to no law, nor were we able to find any, that allows a subsequent action to give preclusive effect under the doctrine of res judicata to a prior action. Because West and Coon failed to argue res judicata in the trial court and because there was no other action prior to Jumamil's claims against West and Coon, res judicata does not bar Jumamil's wage claims against West and Coon.

IV.    WAGE STATUTES – RCW 49.52.050 AND RCW 49.52.070

Jumamil contends the trial court erred when it summarily dismissed Coon from her wage withholding claim under RCW 49.52.050 and RCW 49.52.070 (collectively "the wage statutes") because Coon was Jumamil's employer and he willfully withheld her wages. Jumamil also argues that the trial court erred when it summarily dismissed Coon and West from her wage rebating claim under the wage statutes. Coon responds he cannot be liable for wage withholding

11

because he had no involvement with the payment or non-payment of wages and he did not intentionally or knowingly withhold Jumamil's wages.[7] In response to Jumamil's wage rebating claim, Coon and West maintain that Jumamil failed to establish any issue of material fact that they ever received or collected a rebate of her wages.

A.    THE WAGE STATUTES

The legislature enacted the statutes at issue—RCW 49.52.050 and RCW 49.52.070—in 1939, which are sometimes referred to as the "Anti-Kickback" statutes. *Ellerman v. Centerpoint Prepress, Inc.*, 143 Wn.2d, 514, 519, 22 P.3d 795 (2001). Any "employer or officer, vice principal or agent of any employer" is guilty of a misdemeanor if he or she "[s]hall collect or receive from any employee a rebate of any part of wages theretofore paid by such employer to such employee," or if he or she "[w]ilfully and with intent to deprive the employee of any part of his or her wages" pays the employee less than the wage to which the employee is entitled. RCW 49.52.050(1)-(2). Any "employer or any officer, vice principal or agent of any employer" who violates RCW 49.52.050(1)-(2) shall be liable to the employee "for twice the amount of the wages unlawfully rebated or withheld by way of exemplary damages, together with costs of suit and a reasonable sum for attorney's fees." RCW 49.52.070.

When interpreting statutory language, the court's goal is to carry out the legislature's intent. *Ellerman*, 143 Wn.2d at 519 (citing *Seven Gables Corp. v. MGM/UA Entm't Co.*, 106 Wn.2d 1, 6, 721 P.2d 1 (1986)). "In ascertaining this intent, the language at issue must be evaluated in the context of the entire statute." *Ellerman*, 143 Wn.2d at 519 (citing *In re Sehome Park Care Ctr., Inc.*, 127 Wn.2d 774, 778, 903 P.2d 443 (1995)).

---

[7] West makes similar arguments, but Jumamil did not appeal the trial court's dismissal of the wage withholding claim against West. Thus, we need not respond to West's arguments.

The wage statutes were enacted to prevent abuses by employers in the labor-management setting and they reflect the legislature's strong policy in favor of payment of wages to employees. *Ellerman*, 143 Wn.2d at 519; *Schilling*, 136 Wn.2d at 157. The "fundamental purpose of the legislation, as expressed in both the title and body of the act, is to protect the *wages* of an employee against any diminution or deduction therefrom by rebating, underpayment, or false showing of overpayment of any part of such wages." *Schilling*, 136 Wn.2d at 159 (quoting *State v. Carter*, 18 Wn.2d 590, 621, 140 P.2d 298, 142 P.2d 403 (1943)). Thus, these wage statutes must be liberally construed to advance the legislature's intent to protect employee wages and assure payment. *Schilling*, 136 Wn.2d at 159.

B.     WAGE WITHHOLDING CLAIM

Coon argues he is an absentee owner of the Casino, he had no involvement with the payment or nonpayment of wages, and he had no knowledge of the dealer support policy. Thus, he contends he cannot be liable for the willful and intentional withholding of Jumamil's wages. It is true that Jumamil was terminated before Coon was aware of the dealer support policy, but because Coon was Jumamil's employer and he failed to pay Jumamil her previously withheld wages after learning about the dealer support policy, he knowingly and willfully participated in the willful withholding of her wages and is personally liable under RCW 49.52.070.

1.     EMPLOYER

Coon argues he was merely an absentee part owner of the Casino and was not Jumamil's employer. Under the wage statutes, "employer" refers "to the individual, association of individuals, or corporation engaged in private business, for whom an employee performs the services for which he is hired." *Carter*, 18 Wn.2d at 620. A member-manager-director of an LLC is an employer. *Dickens v. Alliance Analytical Labs., LLC*, 127 Wn. App. 433, 440, 442,

13

111 P.3d 889 (2005). Here, Coon is the sole manager of the Lakeside Casino, LLC, and thus, is an employer.

2.    WILLFUL WITHHOLDING

Relying on *Ellerman*, Coon argues that he cannot be liable for willful wage withholding because only persons who have control over the payment of wages and who act pursuant to that authority may be found liable under the wage claims statutes. Jumamil responds that *Ellerman* is inapposite because its holding applies only to low-level employees responsible for payroll. Jumamil further argues Coon willfully withheld her wages by failing to pay her wages after Coon learned of the dealer support policy at the beginning of October 2010, when Jumamil sent a presuit demand letter to the Casino. We agree with Jumamil.

Under the plain meaning of the wage statutes, an LLC manager is liable for improper wage withholding only where he knowingly participated in the wrongful withholding. *See* RCW 49.52.050, .070. The critical determination for liability under RCW 49.52.050(2) and RCW 49.52.070, therefore, is whether the employer's failure to pay wages was willful. "Willful" means that the "'person knows what he is doing, intends to do what he is doing, and is a free agent.'" *Schilling*, 136 Wn.2d at 159-60 (quoting *Brandt v. Impero*, 1 Wn. App. 678, 681, 463 P.2d 197 (1969)). "The nonpayment of wages is willful 'when it is the result of a knowing and intentional action.'" *Schilling*, 136 Wn.2d at 160 (quoting *Lillig v. Becton-Dickinson*, 105 Wn.2d 653, 659, 717 P.2d 1371 (1986)). Accordingly, the employer must have knowledge of any wage withholding policies and fail to correct any improper wage withholding to be liable under RCW 49.52.070 for wage withholding.

Where the "failure to pay wages owed was willful, the party responsible for the payment of wages may be personally liable." *Morgan*, 166 Wn.2d at 536. In *Morgan*, Funsters Grand Casino, Inc.'s two officers withheld wages from its employees for two pay periods while in Chapter 11 bankruptcy. *Morgan*, 166 Wn.2d at 532. The court held the "legislature intended, under RCW 49.52.070, to impose personal liability on the officers in cases like this because the officers control the financial decisions of the corporation." *Morgan*, 166 Wn.2d at 536. "In other words, the officers control the choices over how the corporation's money is used, and (in cases of unpaid wage claims) RCW 49.52.070 imposes personal liability when the officers choose not to pay wages owed." *Morgan*, 166 Wn.2d at 537.

Generally, the issue of whether an employer acts willfully for purposes of RCW 49.52.070 is a question of fact. *Schilling*, 136 Wn.2d at 160. However, where there is no dispute as to the material facts, we will resolve the case on summary judgment. *Schilling*, 136 Wn.2d at 160 (citing CR 56(c)); *see also State v. Clark*, 129 Wn.2d 211, 225, 916 P.2d 384 (1996) (when reasonable minds could reach but one conclusion from the evidence presented, questions of fact may be determined as a matter of law); *Reichelt v. Johns-Manville Corp.*, 107 Wn.2d 761, 770, 733 P.2d 530 (1987) (if no genuine issue of material fact is presented when the motion for summary judgment is heard, the issue may be summarily resolved).

Here, Coon is listed as the sole manager of the Casino in the amendments to the Casino's operating agreement; he is also listed as the manager and highest ranking officer in the renewal application for the Washington State Gambling Commission. Under the operating agreement, Coon agreed to "oversee the Company's business with the goal of making it profitable and attractive for sale." CP at 364. Coon had the "sole authority to decide whether and when to sell the Company, its assets and/or business." CP at 364. During his time as manager, Coon also

15

made substantial cash infusions into the Casino. Coon learned about the dealer support policy at the beginning of October 2010, but failed to pay Jumamil her previously withheld wages.

Given the operating agreement and Coon's actions as the LLC's manager, it is clear he, like the officers in *Morgan*, had authority over the financial decisions of the Casino and the payment of wages. Still, until he became aware of the dealer support policy he did not exercise his authority to withhold Jumamil's wages. But once Coon learned of the dealer support policy in October 2010, he became a knowing participant. And his subsequent failure to compensate Jumamil for the wages already withheld was knowing and intentional, and thus willful under RCW 49.52.070. Accordingly, Coon is liable for willfully withholding Jumamil's wages and summary judgment dismissing him from the case was improper.

Coon argues *Ellerman* applies and requires a finding that he cannot be liable for wage withholding. *Ellerman* addressed whether Betty Handly was a vice principal under the wage statutes and could be held liable for willfully withholding Michael Ellerman's wages. 143 Wn.2d at 519. The court held that a "vice principal cannot be said to have willfully withheld wages unless he or she exercised control over the direct payment of the funds and acted pursuant to that authority." *Ellerman*, 143 Wn.2d at 521. The court noted that holding vice principals liable using the common law definition of "vice principal"[8] would be inconsistent with the plain language of the wage statutes and "could result in substantial unfairness by imposing personal liability on managers or supervisors who had no direct control over the payment of wages." *Ellerman*, 143 Wn.2d at 522. *Ellerman*, however, does not affect our holding because it applies

---

[8] Under the common law, "an employee is considered a vice principal of the employer if he or she has the authority to direct and supervise the work of the other employee." *Ellerman*, 143 Wn.2d at 520. The ultimate test of whether an employee is a vice principal "is the power of superintendence and control." *Ellerman*, 143 Wn.2d at 521.

only to vice principals and agents, and Coon is Jumamil's employer. Once Coon learned about the dealer support policy and failed to compensate Jumamil for her previously withheld wages, he knowingly and intentionally participated in the wage withholding and is liable under RCW 49.52.070.

Jumamil has already received payment for her withheld wages from Newton, but we reverse the grant of summary judgment dismissing Coon and remand for an entry of costs and reasonable attorney fees against Coon as mandated by RCW 49.52.070.

C.    WAGE REBATING CLAIM

Coon and West contend Jumamil failed to come forward with sufficient facts to create a material issue of fact regarding whether they either collected or received a rebate of wages from Jumamil. We disagree and hold there are sufficient facts, when viewed in the light most favorable to Jumamil, that create a genuine issue of material fact regarding whether Coon and West collected or received a rebate of Jumamil's wages.

Under the wage statutes, any employer, officer, vice principal, or agent of the employer shall be guilty of a misdemeanor if he or she collects or receives a rebate of any part of the employee's wages. RCW 49.52.050(1). Any employer, officer, vice principal, or agent of any employer who violates RCW 49.52.050(1) shall be liable in a civil action for twice the amount of the wages unlawfully rebated, together with legal costs and reasonable attorney fees. RCW 49.52.070. The fundamental purpose of the wage statutes "is to protect the *wages* of an employee against any diminution or deduction therefrom by rebating . . . of any part of such wages." *Carter*, 18 Wn.2d at 621. The aim of the wage statutes is to ensure that the employee realizes the full amount of his or her wages, and that the employer does not evade his or her

obligation to pay wages by a device calculated to effect a rebate of part of them. *Carter*, 18 Wn.2d at 621.

### 1. REBATING OF WAGES

Coon and West contend the dealer support policy was voluntary and did not amount to a rebating of Jumamil's wages. Neither the wage statutes nor case law define "rebate" in the context of the wage statutes. We note, however, that "rebate" is a familiar legal term, and when a familiar legal term is undefined in a statute, the term "is given its familiar legal meaning." *Cashmere Valley Bank v. State Dep't of Revenue*, 175 Wn. App. 403, 417, 305 P.3d 1123 (2013) (quoting *Rasor v. Retail Credit Co.*, 87 Wn.2d 516, 530, 554 P.2d 1041 (1976)), *review granted*, ___ Wn.2d ___, 316 P.3d 494 (2014). A rebate, then, is "[a] return of part of a payment, serving as a discount or reduction." BLACK'S LAW DICTIONARY 1381 (9th ed. 2009).

Our Supreme Court in *Carter* also generally referred to a rebate as a return of any part of the employee's wages. 18 Wn.2d at 622 (It is "unlawful for an elected public official to collect or receive a rebate, or return, of any part of an employee's wages.") (emphasis added). *Carter* further held that the rebate need not be rebated or returned to the hand that actually paid out the wages. 18 Wn.2d at 622 (It does not matter if the rebate "goes into the coffers of the county or into the pocket of the elected public official who has the authority to appoint and to remove the employee."). Additionally, where the return of wages is voluntary, it is not a rebate under the wage statutes. *Carter*, 18 Wn.2d at 622-23. In *Carter*, shortly after Carroll Carter took office as county treasurer of King County, Earl Kline, the chief clerk of the treasurer's office, called a meeting of the employees in the county treasurer's office to discuss the employees raising money to pay off Carter's $3,500 political debt. *Carter*, 18 Wn.2d at 615-17. The employees agreed to raise the money through contributions based on relative proportions of their salaries, which Kline

18

collected on Carter's behalf. *Carter*, 18 Wn.2d at 617. Carter was not a part of the meeting, nor was he aware of the employee's intention to raise money to pay his political debt. *Carter*, 18 Wn.2d at 617. The court held the contributions were not a rebate of wages under the wage statutes, and instead were to a voluntary contribution to paying off Carter's debt:

> Having once received his wages in full, the employee is at liberty to do what he will with his earnings, so long as he does not violate some positive rule of law governing his action. He may keep the money in his pocket, invest it, spend it, or give it away. . . . If an employee exercises his free choice in making a contribution, even though in response to a request, his act does not amount to a rebate of his wages.

*Carter*, 18 Wn.2d at 622-23.

Here, although Jumamil received her earnings, she was not able to exercise her free choice in deciding whether or not to use her wages to gamble, as the employees in *Carter* were able to freely decide to contribute to paying off Carter's political debt. Jumamil, Frydenlund, and Carruthers explained the policy was involuntary in that they had to decide between gambling with their own money during their own time or losing their seniority and hours of work. West also cautioned dealers in his memorandum on the policy that employees would find themselves "on the bottom instantly if they fail one week to maintain a 6 hour average." CP at 243. There are sufficient facts, when viewed in the light most favorable to Jumamil, that create a genuine issue of material fact regarding whether Jumamil was required to rebate, or return, a portion of her wages through gambling at the Casino under the dealer support policy.

Coon and West maintain that because the majority of Jumamil's gambling money went to the other Texas Hold'em players and only a very small percentage of her gambling losses would have gone to the Casino in the form of the $3.00 rake and $0.20 jackpot administration fee the Casino collected for each game, there was no rebating of her wages. The wage statutes,

however, do not allow for the rebating of even a small percentage of an employee's wages. RCW 49.52.050(1) ("Any employer or officer, vice principal or agent of any employer" shall be guilty of a misdemeanor if he or she "[s]hall collect or receive from any employee a rebate of *any part* of wages.") (emphasis added). Thus, Coon's and West's argument fails.

### 2. COLLECTING OR RECEIVING A REBATE OF WAGES

Coon and West next argue that Jumamil failed to present any evidence that they collected or received a rebate of Jumamil's wages.[9] Again, neither the wage statutes nor case law explain what it means to "collect" or "receive" a rebate of wages in the context of the wage rebate statutes. When interpreting a statute, we give effect to the statute's plain meaning. *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002). To determine the plain meaning of an undefined term, we may look to the dictionary. *Estate of Haselwood v. Bremerton Ice Arena, Inc.*, 166 Wn.2d 489, 498, 210 P.3d 308 (2009).

To be held civilly liable under RCW 49.52.070 for wage rebating, the employer, officer, vice principal, or agent of the employer must have either collected or received a rebate of the employee's wages. "Collect" means "to receive, gather, or exact from a number of persons or other sources." WEBSTER'S THIRD NEW INT'L DICTIONARY 444 (2002). "Receive" means "to take possession or delivery of" or "to come into possession of." WEBSTER'S THIRD NEW INT'L DICTIONARY 1894 (2002). There does not have to be an actual physical collection or receipt of wages to satisfy the wage statutes' mandate. It is enough "'where the employee gives up or

---

[9] Relying on *Ellerman*, West also argues he must have "willfully exercised control over the non-payment of wages," to be held liable for collecting a rebate of Jumamil's wages. Resp't's (West's) Br. at 39. *Ellerman*, however, applies only to willful wage withholding under RCW 49.52.050(2) and not to wage rebating under RCW 49.52.050(1). The wage rebating section of the statute does not contain the requirement that the rebating is willful and with intent to deprive, as the wage withholding section does. Thus, *Ellerman* does not apply to RCW 49.52.050(1) and West's argument fails.

cedes a portion of his contractual wage to or in favor of or at the instance of the employer or one acting for or on behalf of the employer.'" *Carter*, 18 Wn.2d at 593 (quoting *United States v. Laudani*, 134 F.2d 847, 849 (3d Cir. 1943)).

Jumamil contends West collected a rebate of her wages on the Casino's behalf. Under the wage statutes, West is an agent of his employer. *See Ellerman*, 143 Wn.2d at 522 (quoting BLACK'S LAW DICTIONARY 85 (4th ed. 1951) (An "agent" is a "person authorized by another to act for him.'")). The evidence demonstrates that West was involved in developing, implementing, and enforcing the dealer support policy. West authored a memorandum explaining the dealer support policy and explaining to the dealers how it worked and the consequences for not meeting the six-hour-per-week average of gambling. When Jumamil approached West about being unable to complete her gambling hours under the dealer support policy because she just had a baby, West told her that she was not the only one who just had a baby and that she may not have a job if she did not gamble per the policy. The Casino also designated West as its CR 30(b)(6) corporate designee on the dealer support policy. Based on this evidence, West arguably gathered or exacted Jumamil's wages while acting for and on behalf of the Casino. Thus, when the evidence and the reasonable inferences therefrom are viewed in the light most favorable to Jumamil, there is a genuine issue of material fact regarding whether West collected a rebate of any of Jumamil's wages.

Jumamil contends that she "gambled away her wages 'in favor of' Coon" and thus Coon, as her employer, received a rebate of her wages. Appellant's Reply Br. at 18. Arguably, as Jumamil's employer, Coon came into possession of a rebate of Jumamil's wages when she gambled with them at the Casino because gambling required her to cede a portion of her wages (in the form of the $3.00 rake and $0.20 jackpot administration fee) to the Casino, which Coon,

21

as the owner, benefited from. West noted the recent spike in the Casino's business, which he attributed to the dealer support policy. Coon has the sole authority to decide when to sell the Casino and gets the first $5,000,000.00 from the sale. Additionally, Coon is the sole manager of the Casino and has the sole authority "to oversee the Company's business with the goal of making it profitable and attractive for sale." CP at 364. He also infused substantial funds into the Casino and shares profits from the Casino equally with Ms. Mudarri. When the evidence and all reasonable inferences therefrom are viewed in the light most favorable to Jumamil, there is a genuine issue of material fact whether Coon received a rebate of any of Jumamil's wages.

V.    ATTORNEY FEES

Jumamil requests attorney fees under RCW 49.52.070, RCW 49.46.090(1), and RAP 18.1. RCW 49.52.070 provides for an award of reasonable attorney fees and costs for employees who prevail in a wage claim civil action. RCW 49.46.090(1) provides for an award of reasonable attorney fees and costs for employees who prevail in a violation of the Minimum Wage Act civil action. Because Coon is liable under RCW 49.52.070 for willful wage withholding, Jumamil is entitled to reasonable attorney fees for prevailing on that claim. Jumamil, however, has not yet prevailed on her wage rebating claim against Coon and/or West. Accordingly, we deny Jumamil's request for attorney fees related to wage rebating. If on remand, however, the trial court determines Coon and/or West are liable for wage rebating, the trial court may award reasonable attorney fees and costs under RCW 49.52.070.[10]

---

[10] At oral argument, Jumamil's attorney mentioned attorney fees in the amount of $125,000. This number corresponds to the amount the trial court awarded Jumamil after the jury trial. It is likely that some of the $125,000 in attorney fees were accrued after the motions for summary judgment and, thus, are possibly not related to the wage-rebating claim.

22

We hold Jumamil's wage claims are not moot and are not barred by res judicata. We hold a manager of an LLC is liable for improper wage withholding only where he knowingly participated in the wrongful withholding. Because Coon continued to withhold Jumamil's wages after learning about the dealer support policy at the beginning of October 2010, he knowingly and willfully withheld her wages in violation of RCW 49.52.070 and is liable to her for attorney fees. Regarding Jumamil's wage rebating claim, we hold there are material issues of fact regarding whether Coon received and West collected a rebate of any of Jumamil's wages. Because the trial court already determined the dealer support policy required a rebate of Jumamil's wages, we remand only for further proceedings regarding whether Coon and West received or collected a rebate of any of Jumamil's wages.

We reverse and remand for further proceedings consistent with this opinion.

Penoyar, J.P.T.

We concur:

Hunt, J.

Worswick, C.J.