IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| RICHARD L. DAUENHAUER, a Resident of the State of Washington, and CLIFFORD HANSEN, a Resident of the State of Washington, | No. 84105-0-I |
| Appellants, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| DAVID SANDERS, a Resident of Washington d/b/a THC LAW FIRM, | |
| Respondent. | |

SMITH, C.J. — Richard Dauenhauer and Clifford Hansen co-owned CMJ Growers, LLC, a marijuana grow business, with Chris Ellis. CMJ and its owners were sued by two employees for withholding wages. David Sanders, the defendants' attorney, failed to file an answer, respond to discovery requests, or respond to a motion for default judgment, which was granted by the court. The defendants hired new counsel and settled shortly thereafter. Dauenhauer and Hansen then began this lawsuit against Sanders, alleging malpractice. They appeal the size of the trial court's judgment in their favor following a bench trial, asserting that it is too low. Because substantial evidence supports the trial court's findings and conclusions that Dauenhauer and Hansen failed to meet their burden to demonstrate several of their theories of damages, we affirm.

FACTS

CMJ Growers, LLC, a marijuana grow business, was owned by Chris Ellis, Clifford Hansen, and Richard Dauenhauer. Ellis owned 51 percent. Hansen initially owned the remaining 49 percent, but sold five percent to Dauenhauer.

Operations of the business were troubled and animosity grew between Ellis, who was its nominal manager, and Dauenhauer and Hansen. Though the precise facts are disputed, Hansen indicated that he was sometimes involved in certain operational matters, and Ellis at times sent both Dauenhauer and Hansen payroll information. Hansen and Ellis occasionally interacted with regulators and contracted for services, including opening lines of credit, in their own names rather than as company representatives. Ellis eventually accused Hansen of improper recordkeeping and embezzlement. Hansen accused Ellis of writing fraudulent checks. Dauenhauer, reflecting on these circumstances a year later, wrote of Ellis's management that "these decisions . . . in most part occurred without our knowledge, but in many cases in spite of our awareness and vehement disagreement." Disagreements grew until Ellis's resignation in December 2018, at which point Hansen took over day-to-day management. Hansen discovered that CMJ's bank account was nearly empty and that Ellis had failed to pay various bills owed, including employee wages. Hansen reports that this left the company without sufficient funds to reliably pay employees.

On May 29, 2019, two CMJ employees sued CMJ, Ellis, Hansen, and Dauenhauer for unpaid wages. This lawsuit—which is separate from the case

2

now on appeal—is referred to throughout the record as the Behnke[1] litigation. CMJ's owners contacted David Sanders, their attorney, to defend against the suit. Sanders entered a notice of appearance on behalf of all three individuals and CMJ itself. Sanders's law practice was primarily transactional, focusing on real estate, and the purpose behind his entry of appearance was apparently to allow the defendants to find their own litigation counsel. Due to a series of personal tragedies, however, he did nothing more, failing to respond to discovery or file an answer. Ellis sought alternative counsel in August 2019. Dauenhauer and Hansen, however, were concerned about conflicts of interest that could arise if they were jointly represented with Ellis, and continued to rely on Sanders. In early September, the plaintiff-employees moved for default against all defendants. Sanders again failed to respond and the trial court granted the motion on September 23, 2019.

At this point, Ellis, represented by the law firm Littler Mendelson, filed an answer on his own behalf and on behalf of CMJ. In October, the plaintiff-employees filed for a motion for entry of default judgment against Hansen and Dauenhauer. Sanders again failed to respond and judgment was entered on October 16; Dauenhauer and Hansen were ordered to pay $123,778.28.

The judgment prompted Dauenhauer and Hansen to obtain separate representation. Dauenhauer managed to vacate the default against him in short order; Hansen held off on vacating his default, preserving the threat of a motion

---

[1] Behnke v. CMJ Growers, LLC, No. 19-2-14257-0 (King County Super. Ct., Wash. Oct. 16, 2019).

to vacate in order to gain leverage in negotiations with the plaintiffs. Negotiations resulted in an $80,000 settlement, which was finalized in late January, 2020. Despite ongoing disagreements about who had the authority to settle on behalf of CMJ, this settlement seems to have encompassed CMJ's liability as well as Dauenhauer and Hansen's, though not Ellis's. The default judgment against Hansen was vacated by the trial court as a part of the settlement agreement.

CMJ, no longer solvent and with its owners bitterly at odds, had already begun selling off most of its remaining assets and initiated corporate dissolution proceedings. A declaration from Hansen supporting appointment of a general receiver indicates that CMJ's debts stood at roughly three quarters of a million dollars, while it possessed only a third of that amount in liquid assets.

Meanwhile, Dauenhauer and Hansen sued David Sanders, initiating the present case. They brought causes of legal malpractice and breach of fiduciary duty, asserting that Sanders's failure to timely respond in the Behnke litigation had led them to suffer significant damages. The trial court concluded at summary judgment that Sanders had committed malpractice, but left for trial the determination of the extent of damages and his liability for breach of fiduciary duty.

At a bench trial, Dauenhauer and Hansen argued several theories of damages that are relevant on appeal. First, they requested damages for the attorney fees they had incurred for replacement counsel. Second, they requested damages for the $80,000 settlement. Third, they requested damages for the lost value of CMJ's cannabis growing business license, which they

4

asserted they had sold in a rush to cover settlement costs. Finally, Hansen asked for damages related to the sale of his home in Colorado, which he alleged he had rushed in order to pay the settlement and which had been sold below market value as a result. The trial court awarded the plaintiffs the attorney fees for replacement counsel through to the time of the settlement, but denied damages based on the other theories.

Dauenhauer and Hansen appeal.

## ANALYSIS

### Standard of Review

Appellate courts "reviewing a trial court's decision following a bench trial . . . ask whether substantial evidence supports the trial court's findings of fact and whether those findings support the conclusions of law." Real Carriage Door Co. v. Rees, 17 Wn. App. 2d 449, 457, 486 P.3d 955 (2021). We do not defer to the trial court's characterization of a challenged decision as factual or legal in nature, but instead analyze it for what it is. Allen v. Dan & Bill's RV Park, 6 Wn. App. 2d 349, 365, 428 P.3d 376 (2018).

Substantial evidence exists to support a finding of fact if the evidence, when viewed in the light most favorable to the prevailing party, is "sufficient to persuade a rational, fair-minded person that the declared premise is true." Rees, 17 Wn. App. 2d at 457. If this standard is met, we will not substitute our judgment for that of the trial court even though we may have resolved a factual dispute differently. Sunnyside Valley Irrig. Dist. v. Dickie, 149 Wn.2d 873, 879-80, 73 P.3d 369 (2003). Unchallenged findings are verities on appeal, and we do

not review the trial court's credibility determinations. Columbia State Bank v. Invicta Law Grp. PLLC, 199 Wn. App. 306, 319, 402 P.3d 330 (2017). Conclusions of law are reviewed de novo. Dickie, 149 Wn.2d at 880.

<u>Legal Malpractice Generally</u>

A brief overview of the structure of legal malpractice claims is useful. Plaintiffs must prove four elements to prevail in a legal malpractice action: (1) the existence of an attorney-client relationship giving rise to a duty of care on the party of the attorney toward the client; (2) an act or omission by the attorney breaching that duty; (3) damage to the client; and (4) that the duty's breach proximately caused the damage. Hizey v. Carpenter, 119 Wn.2d 251, 260-61, 830 P.2d 646 (1992). If a legal malpractice claim makes it to trial, the " 'trier of fact will be asked to decide what a reasonable jury or fact finder [in the underlying trial or "trial within the trial"] would have done *but for* the attorney's negligence.' " Ang v. Martin, 154 Wn.2d 477, 482, 114 P.3d 637, 640 (2005) (alteration in original) (quoting Daugert v. Pappas, 104 Wn.2d 254, 258, 704 P.2d 600 (1985)). Here, the first two elements of Dauenhauer and Hansen's malpractice claim were established at summary judgment, leaving for trial determination of the extent of damages Dauenhauer and Hansen suffered as a result of Sanders's breach of his duty.

By its nature, malpractice can at times blur the line between factual and legal questions. For instance, causation and damages are typically factual questions to be decided by the fact finder. Brust v. Newton, 70 Wn. App. 286, 292-93, 852 P.2d 1092 (1993). In Daugert, though, "questions bearing legal

analysis" underlaid the inquiry of whether a reviewing court would have accepted review, and a judge was in a better position than a jury to make the relevant factual determination. 104 Wn.2d at 258-59. Daugert represents a departure from the standard practice, which still puts questions of causation and damages to the jury absent the existence of a comparable need to engage in legal analysis. Brust, 70 Wn. App. at 292.

But Daugert's reasoning has been relied on to determine whether causation concerning damages resulting from an attorney's alleged negligence at summary judgment, rather than trial, is a question of fact or law in subsequent malpractice litigation. Spencer v. Badgley Mullins Turner, PLLC, 6 Wn. App. 2d 762, 778, 432 P.3d 821 (2018). There, "when evaluating whether a lawyer has presented sufficient admissible evidence on summary judgment to warrant specific performance . . . the cause in fact determination is most appropriately decided by a judge," rather than by the fact finder. Spencer, 6 Wn. App. 2d at 778. The procedural posture of the case on a particular issue therefore informs the standard of review.

### Finding of Fact 26

Dauenhauer and Hansen first challenge the trial court's finding of fact 26. The court found "that [Dauenhauer and Hansen] did not establish that they would have prevailed in the *Behnk[e]* Litigation" and the court therefore denied them recovery of $80,000 in settlement damages. Dauenhauer and Hansen assert that we should review this finding de novo rather than for substantial evidence, arguing that they could not have been found liable for wage withholding as a

7

matter of law. We review this issue for substantial evidence because there is a material dispute of fact concerning whether Dauenhauer and Hansen could have been liable for wage withholding. And we conclude that that even though evidence may allow room for more than one interpretation, substantial evidence supports finding number 26 because Dauenhauer and Hansen did not meet their burden to establish that they would have prevailed.

We begin by addressing Dauenhauer and Hansen's threshold argument: that we should review this finding de novo rather than for substantial evidence. They acknowledge that causation and damages are typically factual questions, but assert that here, a determinative subsidiary question of law lies at the center of our analysis. They contend that they could not have been liable to the Behnke plaintiffs under the statutory provisions that give rise to the relevant cause of action: withholding wages.

RCW 49.52.070 creates civil liability where employers withhold wages. Specifically, it says that

> [a]ny employer and any officer, vice principal or agent of any employer who shall violate any of the provisions of RCW 49.52.050 (1) and (2) shall be liable in a civil action by the aggrieved employee or his or her assignee to judgment for twice the amount of the wages unlawfully rebated or withheld.

The referenced subsection RCW 49.52.050(2) prohibits employers from "willfully and with intent to deprive the employee of any part of his or her wages . . . [paying] any employee a lower wage than the wage the employer is obligated to pay such employee by any statute, ordinance, or contract."

8

Dauenhauer and Hansen raise two related concerns under this statute. First, the corporate structure of limited liability companies such as CMJ protects members from being held personally liable for the company's liabilities if they are being sued purely in their capacity as members. RCW 25.15.126(1). The wage withholding statute, though, permits liability against "officer[s]" and "agent[s]" of employers. RCW 49.52.070. Here, then, for Dauenhauer and Hansen to bear personal liability, it must be because they were acting as agents or officers of CMJ. See Jumamil v. Lakeside Casino, LLC, 179 Wn. App. 665, 684, 319 P.3d 868 (2014) (member-manager of LLC was liable through his managerial role). Second, because of the willfulness element of the wage withholding statute, "the employer must have knowledge of any wage withholding policies and fail to correct any improper wage withholding to be liable." Jumamil, 179 Wn. App. at 684.

These two concerns are related insofar as evidence indicates that members were operating in a managerial capacity. Evidence of a managerial role tends to support liability on two bases: (1) because the member-managers were acting as "officers" or "agents" of the LLC and (2) because managerial involvement may indicate knowledge and willfulness of wage withholding.

Dauenhauer and Hansen claim that undisputed evidence indicated that they were not managers of CMJ, and were therefore neither employers liable under RCW 49.52.070, nor knowledgeable of the wage withholding such that they could have acted willfully. The evidence, they assert, indicated that neither of them operated in a managerial role in the company, and that they did not learn

9

of the wage withholding claims until they were served with the Behnke lawsuit. As a result, they contend that the trial court erred as a matter of law in making finding 26. In essence, they claim that there was no material dispute of fact regarding their degree of involvement with CMJ's day to day operations, meaning that the issue of their liability could have been decided at summary judgment as a matter of law and should now be reviewed de novo.

However, this is not an accurate characterization of the evidence, which demonstrated a clear dispute of fact regarding whether Dauenhauer and Hansen operated in a managerial role. Dauenhauer and Hansen point to the operating agreement governing CMJ's affairs, which states that "[a]ll of the business and affairs of the Company shall be managed by a manager of the Company." They also assert, correctly, that Chris Ellis was CMJ's manager under the operating agreement's terms. And Dauenhauer testified that he first learned of the wage withholding issue when the Behnke litigation began. Beyond this, they do not engage with the evidence brought forward at trial, instead resting on the formalistic logic that because Ellis was legally the only manager, only he could have been personally liable.

But this ignores a wealth of other evidence introduced at trial that casts doubt on Hansen and Dauenhauer's purportedly nonmanagerial role at CMJ. Though Ellis's involvement with CMJ is straightforward on paper, it is far from clear that the company's day-to-day operations matched its nominal assignment of powers and duties. Dauenhauer and Hansen knew enough of Ellis's management for a growing rift and considerable anger to grow between them.

Even before he took over Ellis's managerial role, Hansen seems to have been involved in day to day operations, extending credit to the company and transacting on its behalf. And once he took over for Ellis, Hansen attempted to pay the aggrieved employees for at least some of their unpaid wages, and was clearly operating in a straightforwardly managerial role.

Additionally, Dauenhauer and Hansen endorsed the theory that they had assumed managerial powers during the settlement process of the Behnke litigation. Concerned that Ellis might use his managerial position to block their proposed settlement, they "concluded Mr. Ellis resigned his position as a manager of the LLC[,] . . . [after which,] under Washington's LLC Act, the company became member-managed, meaning Mr. Hansen and Mr. Dauenhauer had authority to settle the plaintiffs' claims against CMJ." While this alone does not go to whether they in fact exercised managerial powers, it certainly indicates that Ellis was not CMJ's sole manager at that time.

In combination with the Behnke complaint, this evidence creates a dispute of fact about RCW 49.52.050(2)'s willfulness element. The plaintiffs in Behnke asserted that they had not received wages "throughout" the course of their employment and that they left on March 24, 2019 because they "had not been paid their full wages despite numerous requests." At least some of this time overlaps with Ellis's absence from the company. And even before his absence, it is far from clear that he was exclusively managing the business.

11

We do not, therefore, review finding of fact 26 de novo. A dispute of fact existed concerning Hansen and Dauenhauer's managerial role. This dispute placed the question of their liability into the hands of the finder of fact.

The question becomes whether substantial evidence supports the trial court's conclusion that Dauenhauer and Hansen failed to meet their burden of proof to demonstrate that they would have prevailed in the underlying action. It does, and our analysis hinges on Dauenhauer and Hansen's burden at trial. Though it is far from certain that Dauenhauer and Hansen in fact exercised managerial control over the relevant decisions not to pay their employees, the record supports the finding by the court that they did. Despite bearing the burden to demonstrate that they did not exercise such control, Dauenhauer and Hansen do no more than rest on their own statements supporting that proposition, demurring from engagement with the larger body of evidence. Crucially, it is for the trial court to determine credibility and weigh and evidence. Here, the evidence presented to the trial court was disputed, but would allow a reasonable fact-finder to conclude that the plaintiffs did not meet their burden to demonstrate that they would have prevailed on this issue. We affirm finding 26 for this reason.[2]

---

[2] Additionally, Dauenhauer and Hansen's arguments about finding 26 appear to support their request for $80,000 in damages for the cost of the settlement. But neither Dauenhauer nor Hansen bore that expense. Hansen loaned CMJ $25,000 towards a first payment, and the balance was funded by the sale of CMJ's grow license. That same sale repaid Hansen his loan. The cost of the settlement was entirely paid by CMJ, not Hansen or Dauenhauer personally.

Finding of Fact 29

Dauenhauer and Hansen next challenge finding 29: "The Court denies Plaintiffs' claims for other consequential damages for lack of sufficient, competent evidence." The consequential damage theories to which the court was referencing were the rushed sales of CMJ's grow license and Hansen's condominium at below market prices in order to fund the settlement. We affirm this finding. Substantial evidence supports the notion that Dauenhauer and Hansen did not meet their burden to show that Sanders's breach of his duty caused their alleged damages.

First, substantial evidence supports the trial court's finding as it concerns the sale of CMJ's grow license. Hansen testified, based on his understanding of the cannabis industry, that CMJ's license would have sold for over half a million dollars under normal market circumstances. Instead, the license was sold in what Hansen characterized as rushed circumstances for $349,000.

But Dauenhauer and Hansen do not sufficiently connect this potential loss, which is based on no more than Hansen's uncorroborated testimony about market rates, with Sanders's malpractice. Ample evidence indicates that CMJ was facing financial troubles even before the Behnke litigation began, going back to at least late 2018, when Ellis resigned. Dauenhauer testified that they had considered either closing the business or selling the license even before the default judgment was entered against them. Sanders testified that the license had been put up for sale in April 2019, before the Behnke litigation began.

Given this, it is far from clear that the Behnke litigation, or Sanders's failure to contest default, had anything to do with the sale of the license. The record instead supports that CMJ's need to sell its license was caused by its insolvency and longstanding mismanagement. Dauenhauer and Hansen do little more than assert that the default forced them to sell the license more quickly than they otherwise would have. They do not provide any real insight into the sales process or what alternatives they considered. We therefore conclude that the trial court's finding was supported by substantial evidence when it comes to whether the plaintiffs met their burden to demonstrate that Sanders's malpractice led to their damages.

Substantial evidence also supports the trial court's finding regarding Hansen's sale of his property in Colorado. Hansen asserted that he sold the property to ensure that he had funds available for settlement. He listed it in July 2019 and sold it in September—around the time of the default judgment—for $122,000. He asserts that an unrushed sale on the open market would have resulted in a sale price of closer to $160,000. He claims the difference between the potential and actual sale prices as damages.

Hansen's claims about his property's potential value, though, are supported by no more than his own testimony and a comparison of the sales of similar properties assembled by his real estate agent. While it is true that property owners may testify about their property's value, they must testify on the basis of " 'relevant and competent methods of ascertaining value.' " Port of Seattle v. Equitable Capital Grp., Inc., 127 Wn.2d 202, 211, 898 P.2d 275 (1995)

(quoting State v. Wilson, 6 Wn. App. 443, 451, 493 P.2d 1252 (1972)).  Hansen's valuation of his property relied in large part on the market comparison prepared by his real estate agent in September 2019.  That comparison, though, appears to have looked at only three similar properties, does not describe the methodology by which the properties were selected, and was not admitted by the trial court as substantive evidence.  Without that comparison to rely on, Hansen's valuation testimony is supported by little more than speculation, and the trial court was entitled to weigh it accordingly.

Additionally, the timing of the listing suggests that similar problems in this argument as were present in Dauenhauer and Hansen's argument about CMJ's grow license.  The property was listed months before the default motion was filed and only shortly after the Behnke litigation began.  If its sale was a response to concerns about settlement or judgment, they were distant and speculative concerns.

Meanwhile, the timeline of the property's sale is uncertain.  Hansen testified that it was sold in September 2019, but also that it was sold after the default judgment, which was entered in mid-October.  Given this uncertainty, it is difficult to know under what circumstances Hansen felt he must sell, and reasonable for the finder of fact to find that Hansen had not met his burden to demonstrate causation.  Hansen's failure to meet his burden is compounded by the timing of the settlement, which was not finalized until January 2020, as well as by his tactical decision not to seek the default's vacation until the settlement's entry.

15

As a result, we conclude that substantial evidence supports the trial court's finding of fact 29.

We affirm.

_____
Smith, C.J.

WE CONCUR:

_____
Hazelrigg, A.C.J.

_____
Dwyer, J.