**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION  II**

| | |
|---|---|
| In re the Marriage of: | No.  45769-5-II |
| AMY S. DeVARGAS,<br>                          Appellant, | UNPUBLISHED OPINION |
| v. | |
| JOSHUA KLEYMEYER,<br>                          Respondent. | |

BJORGEN, J. — Amy S. deVargas appeals the trial court's orders of child support for deVargas's and Joshua D. Kleymeyer's minor children and an order finding her in contempt entered by a superior court commissioner earlier in the proceedings.  DeVargas assigns error to several of the trial court's findings of fact and conclusions of law in support of its orders, contending that the trial court made various errors in calculating the parties' obligations. DeVargas also contends that the trial court erred in holding her in contempt.  Finding errors in the child support orders and in the contempt order, we reverse and remand for further proceedings.

FACTS

I. INITIAL PROCEEDING IN THE OREGON COURTS AND THE KLEYMEYER TRUST

DeVargas and Kleymeyer have two children together, BK and SK. On January 5, 2001, the Multnomah County Circuit Court in Oregon entered a judgment awarding custody of both children to deVargas and ordering Kleymeyer to pay child support. The court also ordered Kleymeyer "to seek further funds for the purpose of paying [his] basic needs and responsibilities from the Irrevocable Trust Created By Clifford Kleymeyer for the Benefit of Joshua David Kleymeyer" (Trust) in the amount of $700 per month "to defray the children's child care costs." Clerk's Papers (CP) at 435. The Trust apparently held substantial assets,[1] distributions, and income, which constituted Kleymeyer's primary or sole source of support at the time.

II. DEVARGAS'S MOVE TO THE UNITED KINGDOM AND
KLEYMEYER'S MOVE TO LOS ANGELES

On October 23, 2001, the Oregon court entered a judgment modifying the January 2001 judgment, allowing deVargas to relocate the boys to the United Kingdom. The modified judgment required Kleymeyer to pay for the children's health insurance and $638 per month in child support "until each child attains the age of 18, or 21 if attending school pursuant to Oregon Law." CP at 430. It made deVargas "responsible for the children's uninsured health costs until such time that more information is available regarding the children's health care cost in the United Kingdom." CP at 430. The modified judgment also provided for the children to visit Kleymeyer in the United States for one month each summer, and allowed Kleymeyer to schedule

---

[1] The record does not establish the exact value of the Trust assets, which passed to Kleymeyer directly when he turned 30 on August 13, 2004.

2

additional visits in the United Kingdom. It made deVargas responsible for one half of the travel expenses for the summer visits and Kleymeyer solely responsible for the remainder of the children's travel expenses, as well as his own.

DeVargas married a United Kingdom citizen, Brendon Keenan, and had two more children. She separated from Keenan in April 2009, returned with all four children to the United States, and settled in Thurston County. According to a declaration submitted to the trial court, deVargas received about $57,000 in the property division resulting from her separation from Keenan, which money she used to relocate, purchase a car, and pay living expenses for the following year.[2]

While deVargas, BK, and SK lived in the United Kingdom, Kleymeyer earned a graduate degree from American University in Washington, D.C., and worked at various professional jobs in the United States, Europe, and New Zealand. He eventually moved to Los Angeles, California, got married, and found employment with The RAND Corporation.

### III. BK's Legal Troubles

In early 2011, the State charged BK with several crimes related to a hit and run accident in Thurston County Juvenile Court. The incident giving rise to the charges occurred in January 2010 and involved a van that went missing from deVargas's driveway. DeVargas hired a private attorney to defend BK, at a total cost of over $14,000. The record indicates that BK received a deferred disposition in December 2011, pursuant to a negotiated plea.

---

[2] In a 2010 pleading, deVargas asserted that she received between $960 and $1,100 monthly from Keenan in "voluntary child support." CP at 362.

IV. 2010 MODIFICATION OF THE OREGON JUDGMENT

Meanwhile, on March 10, 2010, Kleymeyer moved in the Oregon court to modify the 2001 custody and support orders. Kleymeyer specifically raised deVargas's alleged failure to fulfill her obligation under the 2001 judgments to pay a share of BK and SK's travel and uninsured medical expenses.

In an affidavit, Kleymeyer listed his employment as an administrative assistant at The RAND Corporation and his total monthly gross income as $4,687.61. Kleymeyer claimed $2,914.54 in "optional deductions" from his monthly income, including contributions of $417.00 per month to his Roth retirement account savings plan and $2,333.37 to an "Education Fund." CP at 384. Kleymeyer also disclosed that his wife, Kathryn Wood, had $5,406.25 in monthly income. DeVargas asserted that her income, including food stamp benefits and "voluntary child support" from Keenan, totaled between $2,211.00 and $2,351.00 monthly. CP at 362.

On September 7, 2010, the Oregon court entered a supplemental judgment modifying the parenting schedule and child support by stipulation. The court determined Kleymeyer's monthly income to be $5,268 and deVargas's to be $1,455. The judgment specified that Kleymeyer "will continue to pay all of the children's transportation expenses for his parenting time" and will pay "$82 in excess of 4% of his gross monthly income for the children's health insurance." CP at 349. The Oregon court adjusted the monthly child support obligation "downward by a total of $130 per month" for these expenses. CP at 349. The court thus ordered Kleymeyer to pay $910 per month in child support as well as BK and SK's health insurance costs. It made deVargas responsible for the first $250 of uninsured or unreimbursed medical expenses per year.

The judgment also awarded the dependent tax exemptions to Kleymeyer and required him to maintain and make minimum contributions of $1,000 per year to educational savings accounts he had set up for BK and SK. The record shows that in 2010, the accounts specified in the order consisted of two education savings accounts with balances of nearly $20,000 each, as well as two other accounts Kleymeyer held on behalf of BK and SK with balances of around $70,000 each.

The judgment included a parenting plan and addressed responsibility for related transportation as follows:

> Father shall be solely responsible for booking and paying for the children's transportation for his parenting time, and shall provide [deVargas] a copy of all transportation confirmations and itineraries as soon as he receives them. [DeVargas] shall be responsible for getting the children to and from the transportation provider at her end.

CP at 351. The judgment did not, however, award Kleymeyer any amount or offset for his support obligation based on deVargas's alleged failure to pay her share of the unreimbursed medical or transportation expenses under the 2001 judgments. The judgment also specified that except as otherwise modified, the provisions of the 2001 custody and child support orders remain in full force and effect.

## V. KLEYMEYER'S SEPARATION FROM RAND

The RAND Corporation terminated Kleymeyer's employment effective January 27, 2012. The notification letter explained that Kleymeyer "had exhausted [his] protected leave time under the Family and Medical Leave Act" and that RAND's "Short-Term Disability provider's (Sedgwick CMS) adjudication" denied Kleymeyer's short term disability claim. CP at 597. The letter further recited that RAND would "proceed with the separation of [Kleymeyer's]

5

employment as previously communicated" because Kleymeyer had informed the company that his doctor had not released him to return to work and that he would "not be ready to return to active employment in the near future." CP at 597. The record contains no other evidence that Kleymeyer has suffered from any medical problem.

A "notice of unemployment insurance award" from California's Employment Development Department, dated March 12, 2013, lists Kleymeyer's "Claim Beginning Date" as February 24, 2013, his "Claim Ending Date" as February 22, 2014, his "Weekly Benefit Amount" as $291, and his "Maximum Benefit Amount" as $5,147. CP at 976. The notice states that Kleymeyer "must look for full time work each week." CP at 976.

## VI. BK'S MOVE TO LOS ANGELES

At the end of March 2012, deVargas and Kleymeyer agreed in writing to allow BK to live with Kleymeyer in Los Angeles. After initiating further legal proceedings in the Oregon court in June 2012, described below, Kleymeyer stopped making child support payments in August 2012.

## VII. THE OREGON COURT'S DECLINING OF JURISDICTION

On June 29, 2012, Kleymeyer moved to modify the 2001 and 2010 Oregon custody and support judgments. Kleymeyer asked the Oregon court to award him custody of BK, modify the child support and transportation obligations, and award him costs and attorney fees, among other relief.

After receiving service of Kleymeyer's motion and a notice that the Oregon division of child support intended to close her case, deVargas initiated these proceedings pro se in the Thurston County Superior Court. In her "Petition for Modification/Adjustment of Custody

6

Decree/Parenting Plan/Residential Schedule," filed August 17, 2012, deVargas asserted that Washington had jurisdiction and that she had requested that the Oregon court decline to exercise jurisdiction because neither the parties nor their children had resided in Oregon for more than six years. She filed a motion to dismiss the case at the same time in the Oregon court. On December 6, 2012, the Oregon court declined to exercise jurisdiction in favor of Washington and dismissed the proceedings there.

## VIII. DeVargas's Petition in Thurston County Superior Court

In her modification petition, deVargas requested that the court modify the residential and child support provisions of the Oregon judgments due to a substantial change in circumstances. She also requested that the court adjust the transportation and other arrangements.

In her proposed parenting plan, deVargas asked that BK reside with Kleymeyer during the 2012-2013 school year—BK's final year of high school—and visit her for three weeks in the summer, but that BK be allowed to return to her home if he chose to do so. She proposed that the court make Kleymeyer responsible for all transportation costs. DeVargas further requested that the court order Kleymeyer to produce various financial documents, award the dependent tax exemption for SK to her, and require Kleymeyer to pay deVargas's costs and attorney fees. Finally, she requested that Kleymeyer pay his proportional share of BK's legal defense costs.

After the Oregon court declined to exercise jurisdiction, Kleymeyer responded to the petition, asking the court to permanently place BK with him and award him the tax exemptions for both BK and SK. In June 2013, Kleymeyer amended his response, asking the court to establish child support in accordance with the "split custody arrangement" and order deVargas to pay a share of BK's postsecondary education expenses. CP at 456.

On July 15, 2013, deVargas filed a motion to modify the Oregon court's 2010 child support order. She alleged Kleymeyer was voluntarily unemployed, noting that he appears highly employable,[3] and asked the court to impute income to him based on his rate of pay while working at The RAND Corporation. DeVargas also asked the court to deny Kleymeyer a "split custody"[4] deviation and deviate upward from the standard child support calculation based on Kleymeyer's personal wealth, Wood's income, and substantial hardship to deVargas's household.

DeVargas submitted a financial declaration stating that her total monthly income was $2,067.78, including $1,000.00 per month in child support from Keenan, and her total expenses were $2,822.00, and showing debts over $100,000.00, including $82,715.50 in student loans and a debt to her father for BK's legal fees. The declaration discloses that deVargas has a Bachelor of Arts degree and is self-employed.

## IX. KLEYMEYER'S CONTEMPT MOTION

On July 22, 2013, Kleymeyer filed a motion to show cause why a contempt order should not be entered against deVargas, together with motions to amend his response to deVargas's

---

[3] Kleymeyer claims to have a decade of professional experience, primarily in communications, security policy, and international business, and identifies himself as a film producer on his "LinkedIn" professional networking profile. Among other achievements noted on his résumé, Kleymeyer graduated summa cum laude from the American University School of International Studies with a Master's Degree in International Communication, speaks Spanish and French, maintains an active security clearance level with the Department of Homeland Security, and has extensive training with various information technology software.

[4] The nature of the "split custody" determination is explained in part III B of the Analysis.

petition to modify the parenting plan.[5] Kleymeyer based the contempt motion on deVargas's alleged failure to reimburse him (1) $1,294 for her share of medical expenses not covered by insurance incurred between 2009 and 2013, (2) $6,932 for her share of parenting time related travel expenses incurred between 2001 and 2009, and (3) $3,070 for the entire cost of eight flights between 2009 and 2011 that Kleymeyer booked but BK and SK did not take, allegedly "due to Ms. deVargas not complying with established visitation schedules and act[ing] in an obstructionist fashion without legal authority to do so constituting an abusive use of conflict." CP at 999-1000. Kleymeyer based these claims on deVargas's obligations under the 2001 and 2010 Oregon judgments.[6] The motion also includes a request that the court order deVargas to pay Kleymeyer's attorney fees.

Kleymeyer's pleading also amended his response to deVargas's petition concerning BK and SK's postsecondary education. Kleymeyer informed the court that BK had been admitted to Loyola Marymount University (LMU) with a $56,678 estimated annual cost of attendance, of which a "need-based" financial aid and work study award would cover $21,100, asking that deVargas be obligated to pay half of the remainder.[7] CP at 995-96.

---

[5] The pleading also included other motions not relevant here, including one to compel deVargas to obtain a $500,000 life insurance policy, because Kleymeyer wished to obtain policies for BK and SK as "savings vehicles." CP at 997-98.

[6] As discussed, Kleymeyer raised the claims regarding medical and travel expenses in the 2010 proceedings, but did not specifically raise the issue of missed flights. Only three of the flights at issue were missed after entry of the 2010 order.

[7] BK moved out of Kleymeyer's home and began attending LMU on August 26, 2013. The record discloses that both deVargas and Kleymeyer received their Bachelor of Arts degrees from a private institution.

Kleymeyer further requested that the court reduce his child support obligation to reflect his voluntary contribution to his Roth retirement account of $416.66 per month and the entire amount of Wood's health insurance premium, $343.00. Kleymeyer argued in the trial court that "premiums for the children could not be pro rated" because Wood's plan had only three different premium categories, "One Person[,] Two Persons[, and] Three or More." CP at 1297.

Kleymeyer also submitted a financial declaration dated August 16, 2013, in which he left the lines requesting his occupation and highest year of education blank. He gave his total monthly net income as $1,369.70 and total monthly expenses as $12,446.62. He claimed that he was unemployed due to administrative separation and that his gross monthly earnings had been $2,800.00 while working. The record, however, discloses that Kleymeyer admitted to the Oregon court that he earned $3,721.64 per month at RAND. He acknowledged $210.66 per month in interest and dividend income, $1,445.00 per month in "Other Income," and that his wife earned $6,000.00 per month. CP at 574. He claimed to have no stocks or bonds, cash on hand, life insurance, or "[o]ther liquid assets," stating he had only $1,500.00 "[o]n deposit in banks." CP at 575. He claimed more than $8,000.00 in debts, on which he was paying $2,000.00 per month. Finally, he listed $13,000.00 in attorney fees and costs incurred to date.

DeVargas learned in discovery that Kleymeyer had $592,345.60 in the largest of several investment accounts with Morgan Stanley financial planners as of 2012, which accounts had totaled more than $700,000.00 in 2010. DeVargas also learned that Kleymeyer had more than $8,000.00 in bank accounts, and more than $80,000.00 in his Roth retirement account. Kleymeyer also had a whole life insurance policy issued in December 2006 with a "Face Amount" of $1,000,000.00 and an annual premium of $590.00, and over $35,000.00 in his

10

RAND retirement account. In addition, he owned real property generating $1,388.00 in rental income for 2012, among other assets.

X. THE TRIAL COURT'S CONTEMPT ORDER AND WITHDRAWAL OF deVARGAS'S COUNSEL

The parties, both represented by counsel, argued the petition and motions before a Thurston County family and juvenile court commissioner on August 20, 2013. The court made oral rulings on many of the child support and custody issues, including ruling that it would grant the contempt motion at least as to the travel and medical expenses. The court set the matter over for presentation, asking Kleymeyer's counsel to draft an order, and for consideration of the other issues.

Near the conclusion of the August 20 hearing, deVargas's attorney informed the court that he had "entered a notice of withdrawal in this case that will be effective on the 30th." Verbatim Report of Proceedings (VRP) (Aug. 20, 2013) at 30. Although he signed such a notice on August 14, 2013, and timely served it on the parties, it was not actually filed until November 8, 2013. The record does not disclose the reason for this delay.

The court held the hearing on September 10. DeVargas's attorney informed the court that he was no longer her attorney of record and filed a notice of limited appearance.

The court issued a letter ruling on October 25, 2013, noting that it had signed Kleymeyer's proposed contempt order, changing only the amount of attorney fees to reflect the representation of Kleymeyer's attorney at the hearing. The court addressed the letter ruling to deVargas's former attorney, not to her, and mailed it. The attorney did not receive it until November 4, 2013, and immediately informed deVargas.

11

The court filed the contempt order on October 25, 2013. The order included a finding that deVargas "intentionally failed to comply with a lawful order of the court dated on," but did not give any date. CP at 7. It did, however identify the order violated as "related to . . . medical support[,] child care, educational expenses, transportation expenses, or other special expenses." CP at 7. The contempt order found that deVargas had violated the prior order as follows:

> Medical expenses not paid in the amount of $663 for the period of 2013 plus $38.65 interest, for a total of $701.65; in the amount of $223 for the period of 2012 plus $56.73 interest for a total of $279.73; and lastly, in the amount of $409 for the period of 2009, plus $234.56 interest for that time period for a total of $643.57.
> Delinquent travel expenses for the period of 2001 to 2009 in the amount of $6932 plus $3975.64 interest.
> Forfeited travel due to expenses in the amount of $3070 for the period 2009-2011 plus $781.01 interest.

CP at 7. The court did not find that she failed to comply with the parenting plan, however. The court found that she had the past ability to comply with the prior order because "[s]he ha[d] received funds in another divorce action [and] is capable of earning income," and that she had the present ability to comply because she "has income to pay the judgments." CP at 7-8. In addition to the attorney fees, the order required deVargas to pay Kleymeyer $10,002.00 for unpaid child care, educational expenses, transportation expenses and the delinquent and forfeited travel expenses, $1,574.73 for the unpaid medical expenses, and $5,086.59 in interest.

DeVargas filed a motion pro se on November 8, 2013, to revise the commissioner's contempt order. The court denied it as untimely pursuant to the 10-day limit to file motions to revise in CR 5. DeVargas timely appealed the denial of her motion to revise.

12

XI. THE INITIAL ORDER ON MODIFICATION OF CHILD SUPPORT AND CUSTODY

On deVargas's petition for modification and adjustment, the Thurston County court commissioner's letter ruling found Kleymeyer voluntarily unemployed and deVargas voluntarily underemployed, but also found that Kleymeyer "has significant and substantial financial assets available in his household as opposed to" deVargas. CP at 674. The court imputed $3,868.00 in monthly income to Kleymeyer, based on his historical rate of pay, and $9.18 per hour full time to deVargas. The order required Kleymeyer to pay $16,394.76 in back child support and $9,911.20 for BK's legal fees.

XII. CROSS MOTIONS TO REVISE AND THE FINAL MODIFICATION ORDERS

Both parties timely moved to revise the commissioner's order on deVargas's petition. The court granted Kleymeyer's motion entirely and denied deVargas's, except as to her request that the court award her the dependent tax exemption for SK. The court found Kleymeyer involuntarily unemployed based on the RAND separation letter and his receipt of California unemployment benefits. The court thus set his gross income using benefits actually received until February 22, 2014, when his claim ended, imputing income to him after that date at the level of those benefits, $10,293.45 annually.

In granting Kleymeyer's request for a split custody child support calculation, the court declined to consider Wood's income. The court also declined to consider Kleymeyer's household wealth in setting his child support obligation. In addition, the court declined to order Kleymeyer to pay a share of BK's legal fees:

> [t]here is no basis in case law or statute for the Respondent father to be found obligated to pay criminal defense fees for a child of a committed intimate relationship when a parentage decree has been filed years before those fees were

13

incurred, the mother was the custodial parent of the child and the father did not assume an obligation for those fees.

CP at 791. With respect to the health insurance premiums, the court concluded that "[a] parent who pays health care premiums that cannot be pro rated is entitled to a full credit for child support calculation purposes." CP at 792.

The court entered three child support orders to implement its ruling on deVargas's petition. The first concerned only support for SK from September 2013 forward. The court calculated Kleymeyer's net monthly income at $835.39, setting deVargas's proportional share of income at 61.2 percent and Kleymeyer's at 38.8 percent. Because it set Kleymeyer's income below 125 percent of the "Federal Poverty Guideline," the court set his support obligation at the statutory minimum of $50.00 per month going forward, entering judgment in favor of deVargas for back support in the amount of $250.00.

The second and third orders concerned child support obligations for both children, the second from July 2012 to December 2012, and the third from January 2013 through August 2013, the month BK left Kleymeyer's home for LMU. Both orders contained a provision stating that "[t]he child support amount ordered . . . deviates from the standard calculation . . . due to split custody." CP at 813, 829. The second order set Kleymeyer's monthly net income at $1,047.35 and the third order set it at $823.97. Thus, both orders assigned the bulk of the child support obligation to deVargas, assigning Kleymeyer only the statutory minimum. After performing the "'Arvey' Split Custody"[8] calculations, the second order required deVargas to pay Kleymeyer $91.00 per month and the third order required her to pay $65.00 per month for the

---

[8] *In re Marriage of Arvey*, 77 Wn. App. 817, 894 P.2d 1346 (1995).

periods involved, resulting in judgments for Kleymeyer against her of $637.00 and $520.00 respectively.

Thus, the court ultimately ordered deVargas to pay Kleymeyer $907 ($637 + $520 - $250) and obligated him to pay $50 per month in child support going forward. All three orders state that "[t]he mother's request for a deviation based on father's household wealth was denied because only the father's income is to be used in calculating any support obligation." CP at 798. In all of the orders, the portion of the child support worksheet entitled "Additional Factors for Consideration," asking for information about household assets, debts, and other income not part of the standard calculation, was filled in entirely with zeroes. CP at 807. Although the forms ask for "Other Children Living In Each Household," none are listed. CP at 824.

DeVargas appeals.

ANALYSIS

After setting forth the standard of review and briefly describing the relevant statutory framework, we first address deVargas's claim that (1) the trial court erred in refusing to impute income to Kleymeyer based on his earning history. We then consider whether the court erred in (2) denying deVargas's request for a deviation from the standard child support calculation and (3) granting Kleymeyer's request that it determine support according to the *Arvey* split custody formula. Next, we consider whether the court erred in (4) ordering deVargas to pay a share of postsecondary education costs, (5) deducting Kleymeyer's Roth retirement account contributions from his income, (6) crediting him for the entire amount of Wood's health insurance premium, and (7) refusing to order him to pay a share of BK's legal fees. Finally, (8) we address the trial court's contempt order.

15

I. STANDARD OF REVIEW AND GOVERNING LAW

Appellate courts review child support orders for an abuse of discretion. *In re Marriage of Fiorito*, 112 Wn. App. 657, 663, 50 P.3d 298 (2002). We will reverse only if the trial court's decision was manifestly unreasonable or was based on untenable grounds or reasons, considering the purposes of the trial court's discretion. *Fiorito*, 112 Wn. App. at 663-64; *Coggle v. Snow*, 56 Wn. App. 499, 507, 784 P.2d 554 (1990). The party challenging the trial court's decision bears the burden of demonstrating an abuse of discretion. *Schumacher v. Watson*, 100 Wn. App. 208, 211, 997 P.2d 399 (2000).

We will not hold that a trial court's child support determination constitutes an abuse of discretion where the record shows that the trial court "considered all the relevant factors and the child support award is not unreasonable under the circumstances." *State ex. rel. J.V.G. v. Van Guilder*, 137 Wn. App. 417, 423, 154 P.3d 243 (2007). As held in *In re Marriage of Littlefield*, 133 Wn.2d 39, 47, 940 P.2d 1362 (1997),

> [a] court's decision is manifestly unreasonable if it is outside the range of acceptable choices, given the facts and the applicable legal standard; it is based on untenable grounds if the factual findings are unsupported by the record; it is based on untenable reasons if it is based on an incorrect standard or the facts do not meet the requirements of the correct standard.

Consistently with these rules, "[a] trial court . . . necessarily abuse[s] its discretion if it base[s] its ruling on an erroneous view of the law." *Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 339, 858 P.2d 1054 (1993).

In reviewing an order entered on a motion to revise a commissioner's ruling, we generally look to the superior court's decision, not the commissioner's, but "when the superior court denies a motion for revision, it adopts the commissioner's findings, conclusions, and

rulings as its own." *J.V.G.*, 137 Wn. App. at 423. Evidence suffices to support a finding of fact if it is of "sufficient quantum to persuade a fair-minded, rational person of the truth of a declared premise." *Helman v. Sacred Heart Hosp.*, 62 Wn.2d 136, 147, 381 P.2d 605 (1963). When a trial court fails to explicitly articulate findings of fact or distinguish them from conclusions of law, we exercise our discretion in determining what facts the court actually found. *Tapper v. State Emp't Sec. Dep't*, 122 Wn.2d 397, 406, 858 P.2d 494 (1993).

Chapter 26.19 RCW governs the amount of child support obligations, establishing a standardized schedule that sets a presumptive support amount, or "basic support obligation," based primarily on each parent's share of both parents' total net income. RCW 26.19.071, .080. We have described the procedure prescribed by the statute as follows:

> The court must adhere to the following procedure in setting support: compute the total income of the parents, RCW 26.19.071; determine the standard child support level from the economic table, RCW 26.19.020; decide whether to deviate from the standard calculation based on specific statutory factors, RCW 26.19.075; and allocate the support obligation to each parent based on each parent's share of the combined net income. RCW 26.19.080.

*In re Marriage of Maples*, 78 Wn. App. 696, 700, 899 P.2d 1 (1995), *overruled in part on other grounds by In re Marriage of McCausland*, 159 Wn.2d 607, 152 P.3d 1013 (2007). The statute also includes the following statement of legislative intent:

> The legislature intends, in establishing a child support schedule, to insure that child support orders are adequate to meet a child's basic needs and to provide additional child support commensurate with the parents' income, resources, and standard of living. The legislature also intends that the child support obligation should be equitably apportioned between the parents.

RCW 26.19.001. The legislature has further specified that "[w]hen the rights of basic nurture, physical and mental health, and safety of the child and the legal rights of the parents are in conflict, the rights and safety of the child should prevail." RCW 13.34.020.

Although in setting the actual child support obligations, "[a]ll income and resources of each parent's household shall be disclosed and considered by the court. . . . Only the income of the parents of the children whose support is at issue shall be calculated for purposes of calculating the basic support obligation." RCW 26.19.071(1). Thus, for purposes of calculating the presumptive obligation, "[i]ncome and resources of any other person shall not be included." RCW 26.19.071(1). The statute lists sources of money the court must include in a parent's gross income, sources it must exclude from gross income, and expenses the court must deduct from the parent's gross income to determine net income. RCW 26.19.071(3)-(5).

Although courts must calculate the basic support obligation according to the schedule, they retain some discretion to deviate from it; that is, to set one or both parents' actual support obligations at a different amount. The statute provides a nonexclusive list of reasons for which a court may properly deviate from the basic support calculation, but also limits or prohibits deviations based on specified grounds. RCW 26.19.075(1). Courts considering whether to deviate from the schedule must consider, and the parties must disclose, "[a]ll income and resources of the parties before the court, new spouses or new domestic partners, and other adults in the households." RCW 26.19.075(2). The statute mandates that, "[w]hen reasons exist for deviation, the court shall exercise discretion in considering the extent to which the factors would affect the support obligation." RCW 26.19.075(4). Whether the court grants or denies the

request for deviation, it must enter written findings, supported by evidence, specifying the reasons for the decision. RCW 26.19.075(3).

## II. IMPUTATION OF INCOME

DeVargas argues that the trial court erred by calculating Kleymeyer's income based solely on his unemployment benefits and investment income, rather than imputing income to him at his historic rate of pay. DeVargas also argues that the court erred by imputing income to Kleymeyer following the termination of his benefits based on the benefit amount rather than on one of the methods set forth in the statute. We agree.

Although the child support statute requires that courts include income from "[u]nemployment benefits" when calculating child support, it also provides that "[t]he court shall impute income to a parent when the parent is voluntarily unemployed or voluntarily underemployed." RCW 26.19.071(3)(p), (6). The statute enumerates several methods of imputing income in order of priority:

> (a) Full-time earnings at the current rate of pay;
> (b) Full-time earnings at the historical rate of pay;
> (c) Full-time earnings at a past rate of pay where information is incomplete;
> (d) Full-time earnings at minimum wage in the jurisdiction where the parent resides if the parent has a recent history of minimum wage earnings [or] is recently coming off public assistance;
> (e) Median net monthly income of year-round full-time workers as derived from [government statistics].

RCW 26.19.071(6).

The statute specifies that "[t]he court shall determine whether the parent is voluntarily underemployed or voluntarily unemployed based upon that parent's work history, education,

19

health, and age, or any other relevant factors." RCW 26.19.071(6). Thus, the fact that a person receives unemployment benefits does not alone establish that he is involuntarily unemployed.

We have interpreted the term "voluntarily" in this context broadly. We held, for example, that a trial court abused its discretion in refusing to impute income to "a career woman who voluntarily quit working full time to work part time and care for the two children of her new marriage." *In re Marriage of Pollard*, 99 Wn. App. 48, 52, 991 P.2d 1201 (2000). We also reversed a trial court's decision not to impute income to a parent who remarried and stayed at home to raise children. *In re Marriage of Brockopp*, 78 Wn. App. 441, 445-46, 898 P.2d 849 (1995); *accord In re Marriage of Jonas*, 57 Wn. App. 339, 340-41, 788 P.2d 12 (1990). Similarly, we held that a parent who stopped working to attend school was voluntarily unemployed. *Jonas*, 57 Wn. App. at 340-41.

*Goodell v. Goodell*, 130 Wn. App. 381, 122 P.3d 929 (2005), is particularly instructive. The unemployed parent had found a job, but left after a few months because it demanded a long commute that "adversely affected her ability to secure daycare." *Goodell*, 130 Wn. App. at 385. Even though she "present[ed] evidence of attempts to obtain employment," we held that she had not "provide[d] any reasonable explanation about why she failed to hold a job" for 16 months. *Goodell*, 130 Wn. App. at 390. We therefore held that the trial court "abused its discretion when it failed to find [the unemployed parent] voluntarily unemployed and failed to impute income to her according to [chapter] 26.19 RCWA." *Goodell*, 130 Wn. App. at 390.

As discussed, the trial court here found Kleymeyer involuntarily unemployed based on the separation letter and his receipt of California unemployment benefits, for which his award letter stated that he had to seek full time work. The separation letter, however, at most

20

establishes that Kleymeyer told RAND that his doctor had not released him to return to work.

The same letter indicates that RAND's own internal process determined that Kleymeyer did not

qualify for disability leave. No other evidence in the record shows that Kleymeyer had a medical

problem, or what the nature of the problem might be. Even were we to accept that the letter

provides sufficient evidence to support a finding that Kleymeyer could not work at that particular

job for medical reasons, it fails to establish that he could not perform any gainful employment.

As noted above, the statutory factors other than "health," such as "work history, education, . . . .

and age," suggest that Kleymeyer is highly employable. RCW 26.19.071(6).

Under the cases discussed above, Kleymeyer's receipt of California unemployment

benefits also fails to justify the trial court's decision not to impute income to him. While

recipients of such benefits must look for work, that search is limited to "suitable work," that is,

"work in the individual's usual occupation or for which he is reasonably fitted." CALIFORNIA

UNEMPLOYMENT INS. CODE §§ 1253, 1257-58 (West). In addition, the California Supreme Court

interpreted these provisions to mean that a person remains eligible for benefits despite refusing

actual offers of suitable employment for reasons such as "conflict with the performance of [the]

duties of [parenthood]" and "conflict with the requirements of a full-time law student." *Glick v.

Unemployment Ins. Appeals Bd.*, 23 Cal.3d 493, 500, 591 P.2d 24 (1979) (discussing *Sanchez v.

Unemployment Ins. Appeals Bd.*, 20 Cal.3d 55, 69, 569 P.2d 740 (1977)).

Thus, even if Kleymeyer refused offers of remunerative employment *in his usual

occupation* due to a voluntary choice, such as to take care of children or pursue a law degree, he

would remain eligible for unemployment benefits in California. In contrast, the Washington

cases discussed above make clear that such decisions do not render a parent's unemployment

"involuntary" for purposes of determining child support obligations under RCW 26.19.071(6). The record contains no evidence as to whether Kleymeyer (1) complied with the mandate to seek work, (2) received job offers, or (3) if he did, why he refused them. The record does show that he has significant job skills and experience and is 41 years old, but did not obtain work for nearly two years after leaving RAND in January 2012.

For these reasons, substantial evidence in the record does not support the trial court's determination that Kleymeyer's unemployment was involuntary, and the trial court abused its discretion in declining to impute income to him. We reverse and remand with instructions to impute income to Kleymeyer consistently with RCW 26.19.071(6).

Also, although the orders do not show his income as imputed, the record makes clear that the court did impute some income to Kleymeyer. Kleymeyer's benefits ended on February 22, 2014. Thus, the trial court could not have been using his actual income for the period after that, and was necessarily imputing income. When imputing income, the statute requires the court to use one of the enumerated methods in the order of priority. Thus, the trial court also erred by not imputing income to Kleymeyer consistently with RCW 26.19.071(6).

We further note that the record indicates that Kleymeyer had some income during the relevant time, such as capital gains, which the statute required the court to include in his gross income, but which do not appear in the court's calculations. RCW 26.19.071. On remand, the trial court must consider, and require Kleymeyer to disclose, *all* sources of income required by RCW 26.19.071.

III. DENIAL OF DEVARGAS'S REQUEST FOR DEVIATION AND THE *ARVEY* SPLIT-CUSTODY CALCULATION

DeVargas contends that the trial court erred by (1) denying her request for a child support deviation and (2) granting Kleymeyer an "*Arvey* split-custody" deviation without considering Kleymeyer's greater financial resources and deVargas's obligation to support two children from another relationship. We address these in turn.

A.      DeVargas's Request for a Deviation

DeVargas contends that the trial court erred in denying her request for a deviation by failing to consider Kleymeyer's household wealth and deVargas's duty to support the children from her marriage to Keenan. We agree.

In her July 15, 2013 motion for modification of the Oregon child support order, deVargas requested that the court consider not only her "support of other children in [her] house," but Kleymeyer's personal wealth and Wood's income. CP at 461-70. The child support statute includes among the reasons for deviation from the standard calculation, "[s]ources of income . . . [and c]hildren from other relationships." RCW 26.19.075(1)(a), (e).

The "[s]ources of income" category includes the "[i]ncome of a new spouse . . . if the parent who is married to the new spouse . . . is asking for a deviation based on any other reason." RCW 26.19.075(1)(a)(i). The statute specifies that "[i]ncome of a new spouse . . . is not, by itself, a sufficient reason for deviation." RCW 26.19.075(1)(a)(i). Here, deVargas requested a deviation based on other grounds as well, so this provision would justify a deviation in her favor if Kleymeyer were also requesting a deviation "based on any other reason." RCW 26.19.075(1)(a)(i). In part III B, below, we conclude that Kleymeyer's request for a split-

custody calculation should be deemed a request for a deviation. Therefore, under RCW 26.19.075(1)(a)(i), the trial court should have considered Wood's income.

As for "[c]hildren from other relationships," RCW 26.19.075(1)(e) grants the court discretion to deviate from the standard calculation based on such children if "the parent owes [them] a duty of support." RCW 26.19.075(1)(a), (e). The parties do not dispute that deVargas owes a duty to support the two children Keenan fathered who live with her. Thus, the trial court also had a duty to consider her support of these two children in its deviation decision.

Kleymeyer maintains that this provision would only entitle deVargas to a deviation if she owed Kleymeyer child support payments. His brief does not explain how he derives this conclusion from the language of the statute. Furthermore, two of the three orders entered did, in fact, result in deVargas owing support payments to Kleymeyer. Thus, even under Kleymeyer's own reasoning, the court erred in not considering deVargas's duty to support the children of her marriage to Keenan.

Turning next to Kleymeyer's other wealth, RCW 26.19.075(1)(a)(vi) requires the court to consider, in deciding a request for a deviation, "[p]ossession of wealth, including but not limited to savings, investments, real estate holdings and business interests, vehicles, boats, pensions, bank accounts, insurance plans, or other assets." Kleymeyer admittedly possesses many of these types of wealth. Therefore, they should have been considered.

The trial court's only stated reason for denying deVargas's request was that "[t]he mother's request for a deviation based on father's household wealth was denied because only the father's income is to be used in calculating any support obligation." CP at 798. As just shown, RCW 26.19.075(1)(a) requires the court to consider more than just the father's income.

24

The court had a duty to consider "[a]ll income and resources of the parties before the court, new spouses . . . , and other adults in the households" in deciding whether the reasons given justified a deviation. RCW 26.19.075(2). If the court found a deviation warranted, it had a duty to "exercise discretion in considering the extent to which" Kleymeyer's household wealth and deVargas's obligation to support children from other relationships "would affect the support obligation." RCW 26.19.075(4). Instead, the court presumed that it could not consider Kleymeyer's wealth or Wood's income and did not even acknowledge deVargas's other children. Kleymeyer's assets and deVargas's children do not even appear on the preprinted lines designated for these matters on the forms the court used. The court thus applied the wrong legal standard and failed to exercise its discretion as RCW 26.19.075(2) requires. By not considering deVargas's duty to support her other children, the court also failed to exercise its discretion as required by RCW 26.19.075(1)(a)(iv).

Case law also supports the conclusion that the trial court abused its discretion. The facts presented here resemble those in *Brandli v. Talley*, 98 Wn. App. 521, 991 P.2d 94 (1999). There, the appellant father moved to modify the support obligation after the mother married a wealthy man. *Brandli*, 98 Wn. App. at 522-23. The father asked for a deviation from the standard calculation based on the mother's wealth, which the trial court denied on the ground that "[u]nder RCW 26.19.071(1), income of the parents of the children is what is to be considered in setting child support; the court finds that the possession of wealth is that the individual themselves [sic] may have had." *Brandli*, 98 Wn. App. at 525.

On appeal, the mother defended the trial court's decision on the ground that RCW 26.19.075(1)(a)(i) specifies that income from a new spouse cannot by itself justify a deviation

25

and that allowing a deviation based on wealth accumulated from the new spouse's income would defeat the purpose of that provision. *Brandli*, 98 Wn. App. at 525. We reversed, holding that the "wealth [derived from the new husband's income] constitutes something more than the income of a new spouse and may be a sufficient reason for deviation." *Brandli*, 98 Wn. App. at 525. We further specified that "even if [the mother] does not have a significant interest in her husband's assets, his significant wealth and the benefit to her from that wealth, may properly be considered by the trial court in deciding whether a deviation from the standard calculation is warranted." *Brandli*, 98 Wn. App. at 527.

Kleymeyer attempts to distinguish *Brandli* on the ground that he did not accumulate his wealth from his new spouse's income. The *Brandli* court held, though, that "*even if* [the mother] does not have a significant interest in her husband's assets," the trial court had still erred by refusing to consider those assets. 98 Wn. App. at 527 (emphasis added). Thus, the source of Kleymeyer's wealth does not blunt the force of *Brandli*.

Kleymeyer also seeks to distinguish *Brandli* on the ground that Kleymeyer's wealth was not new: the Oregon court knew about that wealth when it set the original obligation. This assertion is irrelevant, as it relates only to whether the parties' circumstances had changed sufficiently to warrant modification, a matter not at issue here. The parties do not dispute the trial court's finding that BK's change of residence provided grounds for a modification. *See In re Marriage of Arvey*, 77 Wn. App. 817, 820-21, 894 P.2d 1346 (1995). "[O]nce a basis for modification has been established, a court may modify the original order in any respect." *In re Marriage of Scanlon & Witrak*, 109 Wn. App. 167, 171-72, 34 P.3d 877 (2001).

26

Finally, in determining whether a trial court has abused its discretion, we look to the purposes for which the legislature has granted that discretion. *Coggle*, 56 Wn. App. at 507. The statute makes clear that purposes of granting discretion in setting child support are "to insure that child support orders are adequate to meet a child's basic needs and to provide additional child support commensurate with the parents' income, resources, and standard of living," as well as to ensure that the support obligations "[are] equitably apportioned between the parents." RCW 26.19.001.

Here, the orders entered resulted in Kleymeyer—a parent with substantial resources and earning potential—owing the statutory minimum, while requiring deVargas—who apparently had substantial debts, supported two children from another relationship, and to whom the court imputed income at the minimum wage—to pay hundreds of dollars in back support to Kleymeyer on behalf of BK. This result is unlikely to ensure support for SK commensurate with Kleymeyer's resources and standard of living and is an inequitable way to apportion the support obligation between deVargas and Kleymeyer. *See In re Marriage of Casey*, 88 Wn. App. 662, 666-67, 967 P.2d 982 (1997) (noting that "the comparative economic circumstances of the parents remains an essential factor in allocating the responsibility for child support" and affirming a downward deviation based on the fact that "assessing a support obligation against [the noncustodial parent] would cause her financial hardship"); *In re Marriage of Glass*, 67 Wn. App. 378, 385-86, 835 P.2d 1054 (1992) (affirming a trial court's upward deviation based on wealth and the income of a new spouse in part because the obligor "remained relatively comfortable" while the custodial parent and the children "were struggling to make ends meet").

The trial court's written findings shall include "reasons . . . for . . . denial of [a party's] request for deviation . . . [from the] standard calculation." RCW 26.19.035(4). A trial court's failure to exercise discretion when presented with a discretionary decision constitutes an abuse of discretion. *See, e.g.*, *Bowcutt v. Delta N. Star Corp.*, 95 Wn. App. 311, 320, 976 P.2d 643 (1999). As shown, the only reason given for the trial court's denial of deVargas's request is contrary to governing statutes and indicates that the court believed it had no discretion to consider Kleymeyer and Wood's wealth, Wood's income, or deVargas's duty to support her other children in setting the parties' support obligations. In light of the statute's purposes and terms, the court acted for untenable reasons. *Littlefield*, 133 Wn.2d at 47. We hold that the trial court abused its discretion in denying deVargas's request for a deviation.

On remand, the trial court shall require Kleymeyer to disclose the full extent of his and Wood's wealth, as well as any assets he holds on behalf of BK and SK. The court shall then consider all matters as required above, including but not limited to Kleymeyer and Wood's wealth, Wood's income and deVargas's children from her marriage to Keenan.

B.      The *Arvey* Split Custody Calculation[9]

In part III A, above, we concluded that if Kleymeyer's request for a split custody calculation is deemed a deviation, Wood's income should have been considered in deVargas's request for a deviation under RCW 26.19.075(1)(a). We agree with deVargas that a split custody calculation should be considered a deviation from the standard calculation.

---

[9] This section pertains only to the two orders involving back support obligations. Because BK had turned 18 and moved out of Kleymeyer's home by the time of the hearings below, the third order, concerning only prospective support for SK, did not involve a split custody situation.

In *Arvey,* we addressed an apparent oversight on the part of the child support statute's drafters:

> When the Legislature enacted Washington's child support statute, RCW 26.19, it did not establish a method for calculating child support when each parent has primary residential care of one or more of the children. Washington courts have therefore been faced with the task of fleshing out an acceptable method that is consistent with the overall purpose of the act.

77 Wn. App. at 823. We face the same situation here: for a significant portion of the period covered by the orders addressing the parties' obligations to support BK—July 2012 to August 2013—deVargas retained the majority of the residential time with SK, while BK spent the majority of his residential time with Kleymeyer.

The *Arvey* court relied on our earlier decision in *In re Marriage of Oakes*, 71 Wn. App. 646, 651, 861 P.2d 1065 (1993). Both the *Oakes* and *Arvey* courts recognized that application of the formulae they discussed provides "a basis for a deviation if strict application of the Table would result in a significant disparity in the amount of support available for the children in each household." *Arvey*, 77 Wn. App. at 824; *Oakes*, 71 Wn. App. at 651-52. This language, of course, could be read to mean only that the *Arvey* calculation may provide the basis for a deviation on some other ground. However, in a portion of a subsequent decision, *State ex rel. M.M.G. v. Graham*, which our Supreme Court ultimately affirmed, we treated the *Arvey* calculation as a deviation by stating, "We remand for recalculation of the basic child support obligation and consideration of *any deviation not based on Arvey* that the court deems appropriate."[10] 123 Wn. App. 931, 941, 99 P.3d 1248 (2004) (emphasis added), *aff'd in part*,

---

[10] As discussed, the trial court plainly recognized that its split custody calculations amounted to deviations from the schedule and labelled them as such.

*rev'd in part*, 159 Wn.2d 623, 152 P.3d 1005 (2007), *abrogated on other grounds by*

*McCausland*, 159 Wn.2d 607 (2007).

We follow this approach of treating the *Arvey* split custody calculation as a deviation.

With that, RCW 26.19.075(1)(a) requires that Wood's income be considered in deciding

deVargas's request for a deviation.

The court's orders make clear that the court believed it could not consider Wood's

income even though it performed a split custody calculation. The court thus applied the incorrect

legal standard, requiring reversal. *Fisons Corp.*, 122 Wn.2d at 339. We hold that the trial court

abused its discretion by not considering Wood's income and other resources available to

Kleymeyer.

## IV. POSTSECONDARY EDUCATION SUPPORT AWARD

DeVargas next contends that the trial court erred in ordering her to pay more than one-

third of BK's college related expenses without considering the effect on her household financial

situation and the wealth disparity between her and Kleymeyer. We agree.

The child support statute provides that "[t]he child support schedule shall be advisory and

not mandatory for postsecondary educational support." RCW 26.19.090(1). The statute

specifies, however, how the trial court should exercise its discretion in imposing and setting the

amount of such obligations:

> When considering whether to order support for postsecondary educational
> expenses, the court shall determine whether the child is in fact dependent and is
> relying upon the parents for the reasonable necessities of life. The court shall
> exercise its discretion when determining whether and for how long to award
> postsecondary educational support based upon consideration of factors that include

but are not limited to the following: Age of the child; the child's needs; the expectations of the parties for their children when the parents were together; the child's prospects, desires, aptitudes, abilities or disabilities; the nature of the postsecondary education sought; and the parents' level of education, standard of living, and current and future resources. Also to be considered are the amount and type of support that the child would have been afforded if the parents had stayed together.

RCW 26.19.090(2). Furthermore, we have held that "postsecondary support must be apportioned according to the net income of the parents as determined under the" child support statute. *In re Marriage of Daubert & Johnson*, 124 Wn. App. 483, 505, 99 P.3d 401 (2004) *abrogated on other grounds by McCausland*, 159 Wn.2d 607. That is, unless the court decides to deviate from the standard calculation, it must apportion postsecondary education support in the same ratio as the basic support obligation.

The child support statute provides that "[n]either parent's child support obligation owed for all his or her biological or legal children may exceed forty-five percent of net income except for good cause shown." RCW 26.19.065. It defines "good cause" as "possession of substantial wealth, children with day care expenses, special medical need, educational need, psychological need, and larger families." RCW 26.19.065(1)(c). We recently held that "postsecondary educational support is part of a parent's 'child support obligation' for the purposes of the 45 percent limitation." *In re Marriage of Cota*, 177 Wn. App. 527, 542, 312 P.3d 695 (2013).

Here, the trial court denied deVargas's motion to revise the commissioner's determination that the circumstances warranted an award of postsecondary support. Thus, the court adopted the commissioner's findings and conclusions, and we review the decision on that basis. RCW 2.24.050; *J.V.G.*, 137 Wn. App. at 423. The court found in relevant part as follows:

13. Both parties discussed and agreed that their children would attend college and this fact was considered in the Oregon order in 2010.

14. It was anticipated by the father and the child that [BK] would enroll at [LMU].

15. The Oregon modified support order from 2010 provided for post-secondary support in that the father was ordered to establish and fund educational accounts for the children's educational expenses, but the Court did not define how the funds in the accounts would be attributed.

CP at 674. The court set the resulting support obligation as follows:

The costs for post-secondary education for the parties' children shall be attributed as follows:

a. Two thirds (2/3) shall be divided between the parties based on their relative incomes on the child support order.

b. One third (1/3) shall be paid by the child; and

c. In the event that the child is unable to meet any expenses, those costs shall be paid from the educational accounts maintained by the father.

CP at 676.

We generally construe the absence of a finding against the party having the burden of proof on the relevant factual issue, unless undisputed evidence in the record compels otherwise. *Mitchell v. Straith*, 40 Wn. App. 405, 412, 698 P.2d 609 (1985); *Lobdell v. Sugar 'N Spice, Inc.*, 33 Wn. App. 881, 887, 658 P.2d 1267 (1983). Where the trial court enters no findings on a particular matter, however, "an appellate court may look to the oral opinion to determine the basis for the trial court's resolution of the issue." *In re Marriage of Booth & Griffin*, 114 Wn.2d 772, 777, 791 P.2d 519 (1990).

Here, Kleymeyer, the party requesting postsecondary support, bore the burden of establishing deVargas's obligation. The evidence in the record and the court's findings may justify some award of postsecondary support. *See Sprute v. Bradley*, 186 Wn. App. 342, 356,

344 P.3d 730 (2015); *Stern*, 57 Wn. App. at 720.  The amount ordered, however, required

deVargas to pay 135.6 percent of the net income imputed to her solely for BK's support.

Since the court set her obligation to support SK at $329 per month, and deVargas

supports two other minor children, the order plainly sets her total obligation to support all her

biological children at more than 45 percent of her net income.  This the court could do only if it

found good cause under RCW 26.19.065(1)(c).  The orders contain no such finding, and the

court's oral ruling reflects no consideration of the relevant factors.

The trial court failed to enter necessary findings in support of its order or to consider

several of the relevant factors.  We hold that the trial court abused its discretion in imposing the

postsecondary support obligation on deVargas, and remand for reconsideration of Kleymeyer's

request under the correct legal standard.

## V.  THE ROTH RETIREMENT DEDUCTION

DeVargas argues that the trial court erred by deducting $417 per month from

Kleymeyer's net income based on voluntary contributions to his Roth retirement account,

because the commissioner found no evidence of a pattern of such contributions and because the

contributions were made for the purpose of reducing Kleymeyer's support obligation.

Kleymeyer contends the court properly deducted the amount because the statute requires it and

he showed a pattern of such contributions in the year preceding the action.

The child support statute requires the court to deduct from a parent's gross monthly

income

> [u]p to five thousand dollars per year in voluntary retirement contributions actually
> made if the contributions show a pattern of contributions during the one-year period
> preceding the action establishing the child support order unless there is a

determination that the contributions were made for the purpose of reducing child support.

RCW 26.19.071(3)(g).  Kleymeyer presented evidence prior to entry of the commissioner's order that he made contributions similar to those at issue during the relevant period.

On the question of whether contributions were made for the purpose of reducing child support, we recognize that a party's intent presents a question of fact, and this court will not disturb a finding of intent supported by substantial evidence.  *See In re Riddell Testamentary Trust*, 138 Wn. App. 485, 491-92, 157 P.3d 888 (2007).  Nevertheless, a full resolution of Kleymeyer's purpose should be made while taking into account our holdings above on his other actions.  We remand for the trial court to reconsider this issue in light of our holdings above.

VI.  BK'S LEGAL DEFENSE EXPENSES

DeVargas next argues that the trial court erred by declining to order Kleymeyer to pay a share of legal fees deVargas incurred to defend BK from criminal charges.  We disagree.

The child support statute requires the court to allocate "special child rearing expenses" between the parents "in the same proportion as the basic child support obligation," and gives it "discretion to determine the necessity for and the reasonableness of all amounts ordered in excess of the basic child support obligation."  RCW 26.19.080(2), (3), (4).  No reported case addresses the meaning of this provision in the context presented here.

The meaning of a statute is a question of law this court reviews de novo.  *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002).  The "fundamental objective" of statutory interpretation "is to ascertain and carry out the Legislature's intent."  *Campbell & Gwinn*, 146 Wn.2d at 9-10.  Where a statute's meaning is plain on its face, "the

court must give effect to that plain meaning as an expression of legislative intent." *Campbell & Gwinn*, 146 Wn.2d at 9-10. Such plain meaning "is discerned from all that the Legislature has said in the statute and related statutes which disclose legislative intent about the provision in question." *Campbell & Gwinn*, 146 Wn.2d at 11. If "the statute remains susceptible to more than one reasonable meaning" after such inquiry, it is ambiguous and this court must "resort to aids to construction, including legislative history." *Campbell & Gwinn*, 146 Wn.2d at 12.

The commissioner found the expense necessary and reasonable and ordered Kleymeyer to pay a share of it, which decision the trial court reversed for the following reasons:

> [t]here is no basis in case law or statute for the Respondent father to be found obligated to pay criminal defense fees for a child of a committed intimate relationship when a parentage decree has been filed years before those fees were incurred, the mother was the custodial parent of the child and the father did not assume an obligation for those fees.

CP at 791. As deVargas points out, the fact that BK was born from a committed intimate relationship is irrelevant to whether the legal defense fees were reasonable or necessary, or constituted child rearing expenses, and the court should not have considered it. Children of such relationships enjoy the same right to support as children born of marriages:

> A child born to parents who are not married to each other or in a domestic partnership with each other has the same rights under the law as a child born to parents who are married to each other or who are in a domestic partnership with each other.

RCW 26.26.106.

The court also relied on relevant considerations, however, such as whether Kleymeyer assumed an obligation to pay the fees. *See VanderVeen*, 62 Wn. App. at 865-67 (holding in the analogous context of private school tuition that a trial court may order such an obligation over

35

the obligor parent's objection only if other conditions provide an adequate legal basis for the obligation). In these circumstances, deVargas fails to establish that the trial court abused its discretion in declining to order Kleymeyer to pay a share of BK's legal fees.

### VII. THE HEALTH INSURANCE DEDUCTION

DeVargas next contends that the trial court erred by allowing Kleymeyer to deduct the entire cost of Wood's health insurance, because the plan covers not only BK and SK but also Kleymeyer and Wood. We agree.

Although it is true that, "[i]n reaching a net child support transfer payment, a parent who pays for health insurance is allowed a credit against his or her basic support obligation equal to the cost of the insurance," we have made clear that the "credit may not include . . . any portion of premium not covering the children at issue." *Scanlon*, 109 Wn. App. at 175. In *Goodell*, we followed *Scanlon* in a situation similar to that here, describing a trial court's decision to allocate a bundled premium by evenly dividing it between three children as reasonable, but only because it deducted some amount for the parent's own coverage. *Goodell*, 130 Wn. App. at 393.

Wood's health insurance premiums could reasonably have been prorated. Wood's plan offered a rate for two persons and another rate for three or more. The difference between the two categories would yield the extra cost attributable to insuring BK and SK. Alternatively, the trial court could simply have divided the premium amount in half. Either method would present a reasonable way to avoid crediting Kleymeyer for the cost of insurance not provided to the boys.

The trial court's method, allowing Kleymeyer to deduct the entire amount of Wood's medical coverage, plainly violated the rule articulated in *Scanlon* by crediting Kleymeyer for a "portion of [the] premium not covering the children at issue," an amount that does not constitute

36

a child rearing expense. 109 Wn. App. at 175. The trial court thus applied the incorrect legal standard and therefore necessarily abused its discretion. *Littlefield*, 133 Wn.2d at 47. We remand for recalculation of the deduction under the proper standard.

## VIII. THE CONTEMPT ORDER

As an initial matter, deVargas's failure to seek revision of the commissioner's contempt order within 10 days of its entry has no bearing on our review. RCW 2.24.050 states that unless a demand for revision is made within 10 days of entry, the order becomes the order of the superior court, "and appellate review thereof may be sought in the same fashion as review of like orders and judgments entered by the judge." *Accord State v. Mollichi*, 132 Wn.2d 80, 93, 936 P.2d 408 (1997). Thus, after 10 days from entry of the commissioner's order deVargas's only route of review was with the Court of Appeals.

As to the merits of the contempt order, deVargas first contends that the trial court erred because certain of the claims underlying Kleymeyer's motion were precluded by the 2010 litigation. She further contends that the court erred by holding her in contempt without finding she acted in bad faith or identifying the order she allegedly violated. Finally, she maintains that the trial court erred in determining that she had the ability to pay the amount ordered.

A.    Claim Preclusion

DeVargas argues that certain of the claims underlying the contempt motion were precluded by a final judgment favorable to her in a prior proceeding in which Kleymeyer raised or had the opportunity to raise them. We agree.

The interpretation of a child support order presents a question of law that this court reviews de novo. *In re Marriage of Sagner*, 159 Wn. App. 741, 749, 247 P.3d 444 (2011).

Whether res judicata bars a claim also presents a question of law we review de novo. *Jumamil v. Lakeside Casino, LLC*, 179 Wn. App. 665, 680, 319 P.3d 868 (2014). Res judicata, or claim preclusion,

> encompasses the idea that when the parties to two successive proceedings are the same, and the prior proceeding culminated in a final judgment, a matter may not be relitigated, or even litigated for the first time, if it could have been raised, and in the exercise of reasonable diligence should have been raised, in the prior proceeding.

*Kelly-Hansen v. Kelly-Hansen*, 87 Wn. App. 320, 328-29, 941 P.2d 1108 (1997) (internal footnotes omitted). The doctrine thus applies not only to matters actually raised in the prior proceeding, "'but to every point which properly belonged to the subject of litigation, and which the parties, exercising reasonable diligence, might have brought forward at the time.'" *Golden v. McGill*, 3 Wn.2d 708, 720, 102 P.2d 219 (1940) (quoting *Currier v. Perry*, 181 Wash. 565, 44 P.2d 184 (1935)).

A child support order plainly qualifies as a final order for purposes of claim preclusion. *Furgason v. Furgason*, 1 Wn. App. 859, 860-61, 465 P.2d 187 (1970). The *Furgason* court refused to order the obligor under a temporary support order to pay unpaid child support amounts that the obligee could have brought to the court's attention in the subsequent divorce proceeding. *Furgason*, 1 Wn. App. at 861.

The 2010 litigation in Oregon involved the same parties and issues in dispute here: the obligations of the parents regarding parenting and support of BK and SK. The record establishes that deVargas's alleged failure to reimburse Kleymeyer for travel expenses was a contested issue. The judgment contained various provisions addressing transportation and specified that

Kleymeyer "will *continue* to pay *all* of the children's transportation expenses for his parenting time."  CP at 349-52 (emphasis added).

Kleymeyer certainly could have and apparently did raise deVargas's claimed failure to reimburse him for transportation expenses in the 2010 proceedings.  The litigation resulted in a final judgment favorable to deVargas on the issue.  The resulting order recites that "the parties reached agreement on *all issues* before the court, which agreement was recited into the record and affirmed by both parties."  CP at 347 (emphasis added).

The 2010 order also expressly addressed uninsured medical expenses and the duty to provide the boys for scheduled visitation travel.  It further recited that "[a]ll child support due through February 2010 from [Kleymeyer] to [deVargas] pursuant to any order entered in this case has been paid in full" and awarded Kleymeyer the tax exemptions for both boys.  CP at 354-55.

Thus, the stipulated judgment plainly resulted from negotiations on all the various matters at issue between deVargas and Kleymeyer involving parenting and support of BK and SK.  Any claim Kleymeyer had for amounts deVargas may have owed under the 2001 judgments, or her failure to provide the boys for scheduled travel, thus belonged to the subject of the 2010 litigation, and Kleymeyer, exercising reasonable diligence, might have brought such claims forward at that time.

The order entered September 7, 2010, also provided that except as modified, the provisions of the 2001 judgments shall remain in full force and effect.  Nonetheless, res judicata bars any claim Kleymeyer had regarding deVargas's obligations under the 2001 judgments of which he, with reasonable diligence, could have raised during the 2010 proceeding.

39

Kleymeyer incurred many of the expenses at issue in the contempt motion well before the conclusion of the 2010 proceedings. Accordingly, we hold that the trial court erred in holding deVargas in contempt for failure to fulfill obligations that arose under the 2001 judgments prior to September 7, 2010.

B.      Failure To Identify the Orders Violated or Find Bad Faith

DeVargas also argues that the trial court erred by holding her in contempt without identifying the order she allegedly violated or finding she failed to provide the boys for scheduled travel in bad faith. We agree that the contempt order is unclear and rests largely on improper bases.

We review a trial court's decision in a contempt proceeding for an abuse of discretion. *In re Marriage of Eklund*, 143 Wn. App. 207, 212, 177 P.3d 189 (2008). Appellate courts will "uphold a finding of contempt even though the trial court did not rely on any particular theory as long as a proper basis can be found." *State v. Boatman*, 104 Wn.2d 44, 46, 700 P.2d 1152 (1985).

We strictly interpret orders the "violation of which provides the basis for contempt proceedings[.]" *Graves v. Duerden*, 51 Wn. App. 642, 647, 754 P.2d 1027 (1988). Thus,

> [i]n contempt proceedings, an order will not be expanded by implication beyond the meaning of its terms when read in light of the issues and the purposes for which the suit was brought. The facts found must constitute a plain violation of the order.

*Johnston v. Beneficial Mgmt. Corp. of Am.*, 96 Wn.2d 708, 712-13, 638 P.2d 1201 (1982).

Contempt of court means, in relevant part, "[d]isobedience of any lawful judgment, decree, order, or process of the court." RCW 7.21.010(1)(b). The statute defines two types of sanctions: punitive sanctions, which are "imposed to punish a past contempt of court for the

purpose of upholding the authority of the court," and remedial sanctions, which are "imposed for the purpose of coercing performance when the contempt consists of the omission or refusal to perform an act that is yet in the person's power to perform." RCW 7.21.010(2), (3).

Another statute specifically governs contempt orders in child support proceedings and provides various bases for holding a parent in contempt. RCW 26.09.160. The contempt order at issue here expressly relies on this statute for its authority. CP 6-13. The statute provides in relevant part that

> [a]n attempt by a parent . . . to refuse to pay ordered child support, to refuse to perform the duties provided in the parenting plan, or to hinder the performance by the other parent of duties provided in the parenting plan, shall be deemed bad faith and shall be punished by the court by holding the party in contempt of court and by awarding to the aggrieved party reasonable attorneys' fees and costs incidental in bringing a motion for contempt of court.

RCW 26.09.160(1). The statute contains a separate provision governing violations of the residential provisions of a parenting plan. RCW 26.09.160(2). That provision imposes specific remedies, including additional time with the child equal to the time missed, court costs and reasonable attorney fees incurred as a result of the noncompliance, and "any reasonable expenses incurred in locating or returning a child[,]" and a civil penalty. RCW 26.09.160(2).

The order at issue here contains a section entitled "How the Order was Violated," which lists the following items: "Medical expenses not paid . . . , delinquent travel expenses for the period of 2001 to 2009 . . . , [and] [f]orfeited travel due to expenses in the amount of $3070 for the period of 2009-2011." CP at 7. As discussed, the court could not properly hold deVargas in contempt for failure to pay medical expenses if Kleymeyer could, with reasonable diligence, have raised the failure to pay in the 2010 proceedings. The 2010 order addressed uninsured

medical expenses, among other topics. Therefore, the court erred in holding deVargas in contempt for failing to pay medical expenses.

As for the delinquent travel expenses, the 2010 order plainly required Kleymeyer to "continue to pay all of the children's transportation expenses for his parenting time." CP at 349. Thus, deVargas could not have violated that order by failing to pay travel expenses.

The contempt order also rests on forfeited travel. The Oregon orders, however, say nothing about deVargas reimbursing Kleymeyer for any missed flights.[11] Thus, the only way she could be in contempt under RCW 26.09.160(1) for the boys missing flights would be if she attempted to cause them to do so in bad faith, which would constitute failure to comply with the Oregon orders' parenting plan. The court made no finding, however, that deVargas did anything to cause the children to miss the flights, let alone that she did so in bad faith.

Further, the record discloses no basis for such a finding. Kleymeyer's e-mails regarding the 2009 and 2010 flights show that he acquiesced in the boys' refusal to go, if only reluctantly. One of these e-mails refers to the possibility of rescheduling the flight, indicating that Kleymeyer may not actually have forfeited the fare. With respect to the 2011 flight to Los Angeles, which BK missed because the juvenile court prohibited him from leaving Washington, we are aware of no authority establishing that a parent has a duty to seek modification of a juvenile court order to facilitate visitation. Nor does the record establish that deVargas could have obtained the juvenile

---

[11] Another problem with the "forfeited" travel is that the evidence on which the court relied does not establish that Kleymeyer forfeited any travel expenses. The ticket confirmation documents Kleymeyer submitted contain language indicating that Kleymeyer could have postponed the flights or used the funds expended for future visitations.

court's consent had she sought it. Thus, were we to imply in the contempt order the finding necessary to support the trial court's ruling, substantial evidence would not support it.

Under the strict construction rule articulated in *Johnston*, 96 Wn.2d at 712-13, deVargas could not be in contempt for failing to do something unless the Oregon orders clearly required her to do it. The trial court's contempt order is unclear, but appears to find her in contempt for something the Oregon orders did not require: neither the court's oral ruling nor the written order contain any finding that deVargas improperly attempted to cause the children to miss flights.

Contrary to Kleymeyer's suggestion, these are not problems that a court can fix nunc pro tunc: "The purpose of a nunc pro tunc order is to record some prior act of the court which was actually performed but not entered into the record at that time." *State v. Rosenbaum*, 56 Wn. App. 407, 410-11, 784 P.2d 166 (1989) (emphasis omitted). Here, the court's order simply fails to make the reasons for its ruling clear. To the extent that it does give reasons for its contempt ruling, they do not properly support it.

We vacate the contempt order and remand for reconsideration of Kleymeyer's motion in light of this opinion. We also vacate the trial court's attorney fee award to Kleymeyer. If the trial court again finds deVargas in contempt on remand, it must clearly specify which order she violated and how. Resolving the issue on these grounds, we decline to consider deVargas's argument that the trial court erred in ruling that she had the ability to pay the amounts at issue.

IX. ATTORNEY FEES ON APPEAL

Both parties request attorney fees on appeal, and devote sections in their briefs to the issue, as RAP 18.1 requires. Kleymeyer, however, fails to identify what provision of law entitles him to a fee award, instead referring to various matters not in the record and asking us to

consider them under RAP 9.11. Because he failed to identify any basis for a fee award, we do not consider it further.

DeVargas bases her fee request on RCW 26.09.140, which gives family courts discretion to shift fees "after considering the financial resources of both parties," and appellate courts discretion to "order a party to pay for the cost to the other party of maintaining the appeal and attorneys' fees in addition to statutory costs." The record shows that Kleymeyer has far more resources than deVargas, who supports three minor children in her household. Further, deVargas's appeal raises almost entirely meritorious issues. Therefore, we grant deVargas's request and deny Kleymeyer's.

CONCLUSION

The trial court erred by (1) declining to impute income to Kleymeyer consistently with the statute, (2) failing to consider Kleymeyer's possession of wealth, his spouse's income, and deVargas's duty to support the children from her marriage to Keenan in ruling on the parties' requests for deviations from the child support schedule, (3) ordering deVargas to pay postsecondary support in excess of 45 percent of her net income without a finding of good cause and without considering the effect on her household, (4) allowing Kleymeyer to deduct the entire cost of his wife's health insurance plan, and (5) holding deVargas in contempt.

We vacate the trial court's order on show cause for contempt/judgment, filed October 25, 2013, the three orders of child support filed February 28, 2014, and the findings of fact, conclusions of law, and order on cross motions for revision, also filed February 28, 2014; and we remand for further proceedings consistent with this opinion. We vacate the trial court's fee

44

No. 45769-5-II

award to Kleymeyer, grant deVargas's request for fees on appeal, and deny Kleymeyer's request for fees on appeal.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

BJORGEN, J.

We concur:

JOHANSON, C.J.

MELNICK, J.